Charles E. Hansberry
Jeffrey M. Roth
GARLINGTON, LOHN & ROBINSON, PLLP
350 Ryman Street • P. O. Box 7909
Missoula, MT  59807-7909
Telephone (406) 523-2500
Telefax (406) 523-2595
cehansberry@garlington.com
jmroth@garlington.com

Attorneys for Plaintiff Balance Point Divorce Funding, LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| BALANCE POINT DIVORCE FUNDING, LLC, a Nevada Limited Liability Company, | Cause No. CV-12-40-BU-SEH |
| Plaintiff, | |
| v. | |
| LILA MASTERS, | PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANT'S MOTION FOR RELIEF OF COURT NOTICE OBLIGATIONS (DKT. 57) |
| Defendant, Counterclaimant, Third-Party Plaintiff, | |
| v. | |
| JOHN DOES 1-5, and JANE DOES 1-5, | |
| Defendants, | |
| v. | |
| STACEY NAPP, | |
| Third-Party Defendants. | |

1309930

TABLE OF CONTENTS

Page

I.     INTRODUCTION ....................................................................................1

II.    ARGUMENT..........................................................................................5

       A.     Applicable Standard. ............................................................5

       B.     BP Is Entitled To A Preliminary Injunction.........................7

              1.     Likelihood Of Success/Serious Questions Going To
                     The Merits. ..................................................................7

                     a.     *Masters is in breach of a valid and enforceable
                            contract.* ...........................................................7

                     b.     *There is a likelihood that BP will succeed on the
                            merits of Masters' counterclaims.* ...................7

                     c.     *BP had no obligation to increase its funding.* .................9

                     d.     *BP was justified in being substantively involved
                            in the Divorce strategy.* ...................................12

                     e.     *Masters failed to mitigate her speculative damages.* ......17

              2.     Irreparable Injury. .....................................................20

              3.     Balancing Of The Equities.........................................22

              4.     The Public Interest. ...................................................25

III.   CONCLUSION......................................................................................26

CERTIFICATE OF COMPLIANCE.......................................................27

# TABLE OF AUTHORITIES

**Cases**

*AAA Const. of Missoula, LLC v. Choice Land Corp.*,
    2011 MT 262 ......................................................................................9

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ......................................................7

*Augustine v. Simonson*,
    940 P.2d 116 (Mont. 1997)...........................................................19

*Deckert v. Indep. Shares Corp*,
    311 U.S. 282 (1940).......................................................................6

*Del Webb Comn. v. Partington*,
    652 F.3d 1145 (9th Cir. 2011) ......................................................8

*Erie R.R. Co. v. Tompkins*,
    204 U.S. 64 (1938)........................................................................5

*Hardy v. Vision Serv. Plan*,
    2005 MT 232 ....................................................................... 10, 12

*Lough v. Bount*,
    336 F. Supp. 627 (D. Mont. 1971) ...............................................5

*Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*,
    856 F.2d 1445 (9th Cir. 1988) ......................................................6

*Pallister v. Blue Cross & Blue Shield of Mont.*,
    2012 MT 198 ....................................................................... 19, 20

*Pfau v. Mortenson*,
    858 F.Supp. 2d 1150 (D. Mont. 2012) ........................................10

*Phillips v. Mont. Ed. Assn.*,
    610 P.2d 154 (Mont. 1980).................................................. 12, 16

1309930

*R.C. Hobbs Ent., LLC v. J.G.L. Dist., Inc.*,
    2004 MT 396 ...........................................................................9

*Shammel v. Canyon Resources Corp.*,
    2003 MT 372 ................................................. 5, 6, 20, 22, 23, 25

*Sims Snowboards, Inc. v. Kelly*,
    863 F.2d 643 (9th Cir. 1988) ............................................5

*Stensvad v. Miners & Merchants Bank of Roundup*,
    640 P.2d 1303 (Mont. 1982)...........................................18

*The Fansler Found. v. Am Realty Inv., Inc.,*
    2007 WL 1302742 (E.D.Cal. May 2, 2007)....................5

*Van Loan v. Van Loan*,
    895 P.2d 614 (Mont. 1995).......................... 6, 20, 22, 25

**Statutes**
IRC §1041(a).................................................................24

Mont. Code Ann. §27-19-201(3) ..................................20

Mont. Code Ann. §30-14-103 .......................................10

Mont. Code Ann. §40-4-201 .........................................19

Mont. Code Ann. §40-4-201(3) .....................................19

Mont. Code Ann. §40-4-202(1) .....................................20

**Other Authorities**
Charles Alan Wright, Arthur Miller, Mary Kate Kane & Richard L. Marcus,
    11A *Fed. Prac. & Proc. Civ.* § 2948.1 (2d ed.) .............6

Fed. R. Civ. P. 65 ..........................................................5

Montana Consumer Protection Act.................................10

1309930

Plaintiff, Balance Point Divorce Funding, LLC ("BP"), respectfully submits its Brief in Support of Motion for Preliminary Injunction and in Opposition to Defendant's Motion for Relief of Court's Notice Obligations (Dkt. 57).

## I.   INTRODUCTION

This litigation involves a dispute between BP, a third-party litigation funding company, and its client, Lila Masters ("Masters"). Masters entered into two separate funding agreements with BP: a Purchase Agreement dated May 24, 2011 and a First Amended and Restated Purchase Agreement dated September 29, 2011 (the "Agreement"). SUF¶58[1] Under the Agreement, BP advanced $310,435 on Masters' behalf in exchange for a 25% interest in the claims to marital property she was asserting in the dissolution proceedings (the "Divorce") with her husband, Tim Scrantom ("Scrantom"). In April 2012, Masters settled the Divorce whereby Scrantom is to pay her cash in the amount of $2.25 million and shares of stock which Scrantom valued at $2,005,000. SUF¶91.

On June14, 2012, Scrantom made the fie first payment to Masters of $719,000. SUF¶94. In July, Scrantom also paid Masters $41,664, which was the first quarterly payment owed to Masters under a promissory note for $1.5 million. SUF¶99. Masters has testified that Scrantom is in breach of the settlement

---

[1]     Contemporaneously with filing the instant motion for preliminary injunction, BP has also Moved for Partial Summary Judgment. Dkt. 69. "SUF" refers to the Statement of Uncontroverted Facts (Dkt. 74) filed pursuant to L.R 56.1.

agreement as has not paid the remainder of the initial payment ($31,000) and he also failed to make the second quarterly payment of $41,664 on the promissory note.  SUF¶100.  Curiously, even though Scrantom is currently in breach of the settlement agreement in the Divorce, Masters testified that she has not taken any steps to enlist the Divorce Court's assistance in compelling Scrantom to pay her. SUF¶104.

Masters is likewise in breach of the Agreement with BP.  Despite receiving more than $770,000 to date under the Settlement Agreement, she has not paid a single dime to BP for its $310,435 investment in her case.  SUF¶101.  BP is not alone however, as Masters has shafted almost all of the lawyers that represented her in the Divorce.  SUF¶102.  Instead, Masters is spending the money she has received at a rapid pace that exceeds her ability to maintain.  For example, shortly after receiving the first payment of $719,000, rather than pay any of her lawyers or BP, Masters depleted her cash by $510,000 to pay for an up-scale home in Bozeman, Montana (the "Home").  SUF¶98; *see also* Dkt. 36.  Masters has also paid retainers totaling $70,000 to new attorneys to help her avoid her financial responsibilities.  SUF¶103.  Finally, although she has few fixed living expenses (SUF¶107) – especially since she paid cash for the Home – Masters nevertheless expends considerable funds on a monthly basis for discretionary purchases, such as vacation travel and shopping in New York City, Vail and Sante Fe, ng trips and

2

regular dining out at expensive restaurants.  Decl. Stacey Napp ¶65 (Dec. 12, 2012)

(filed concurrently).

Initially, BP felt that it might need to seek injunctive relief from the Court in

order to protect its 25% interest and sought to move quickly to conduct the

necessary discovery to make such a motion.  However, in consideration for

delaying this discovery, Masters filed a Notice to the Court (Dkt. 21) in which she

represented:

> The attorneys came to an agreement that Lila Masters will not to
> expend [sic], transfer or otherwise dissipate any of her assets that she
> is in possession of or is to receive under her property settlement
> agreement in the underlying divorce litigation pending further order of
> this Court.  Further it was agreed that Ms. Masters would be permitted
> to expend up to $15,000 per month in living expenses pending further
> Order from this Court.

In reliance on her representation and agreement, BP reasonably believed that

Masters would bring her rampant spending under control.

On October 26, 2012, Masters moved the Court for approval of a settlement

she reached with one of her attorneys in the Divorce, Mark Mason ("Mason").[2]

Under the terms of that settlement, Masters was to pay Mason a total of $90,000,

$40,000 now, and another $50,000 on or before December 1, 2013.  Dkt. 39-1, ¶2.

However, if Masters fails to make that second payment, this settlement agreement

---

[2]  BP believes that this motion was Dkt. 38; however, the motion refers to a
settlement with another one of her attorneys, David Parker and Parker Shumaker
Mills LLP.  Masters' Brief in Support (Dkt. 39) discusses the settlement with
Mason.

provides for the enforcement and foreclosure of a $270,555.35 mortgage on the

Home.  *Id.*, ¶3.  The Home represents the current single largest asset that BP could

seek collection against, an asset that was purchased in part with funds that should

have been paid to BP.  BP is currently unaware of the status of this agreement with

Mason.

      Nevertheless, due to that motion, BP learned that Masters was not meeting

the terms of the Notice and instead continues to spend money at a pace that clearly

is beyond the means of someone who should be on a budget and far in excess of

the $15,000 per month she agreed to in the Notice (Dkt. 21).  As of September 24,

2012, the balance in Masters' two bank accounts had been $143,742.  SUF¶108.

Masters testified that, as of November 9th, she only had approximately $61,780

remaining (SUF¶106), *indicating that she had expended $81,962 in just forty-seven*

*days*.  For comparison, if Masters had kept with her agreement to expend only

$15,000 a month, she should have only expended around $23,500 over that period

of time.  Of the $81,962 expended, $40,000 was for the first payment to Mason.

SUF¶106.  However, that still left almost $42,000 in expenditures for a person who

does not have a mortgage or a car payment and admittedly does not financially

support her two children. SUF¶107.  [3]

      Masters has now filed a motion to be completely relieved of her obligations

---

[3]BP calculates this figure as [47 ÷ 30] x $15,000.

4

and agreement in the Notice to limit her spending to no more than $15,000 a

month.  Dkt. 57.  Not only should Masters motion be denied, the Court should

issue a preliminary injunction as follows:

- Enjoining Masters from spending  no more than $15,000 per month without further order of the Court, such spending to include living expenses and any attorneys' or professional fees and costs that she may incur;

- Require that Masters provide to BP on a monthly basis her bank account statements so that her compliance with the injunction can be monitored;

- Enjoining Masters from further encumbering the Home until the conclusion of this matter; and

- Requiring that Masters deposit any other property that she receives in the Divorce (i.e. shares of Juridica, further payments from Scrantom) with the Court for safekeeping.

## II.  ARGUMENT

### A.  Applicable Standard

Because federal jurisdiction in this case is based upon diversity, the issuance

of a preliminary injunction is a mixed question of federal and state law.  Although

a preliminary injunction is procedurally provided under Fed. R. Civ. P. 65, the

Court is to apply state substantive law under *Erie R.R. Co. v. Tompkins*, 204 U.S.

64 (1938).  *Sims Snowboards, Inc. v. Kelly*, 863 F.2d 643, 647 (9th Cir. 1988); *The

Fansler Found. v. Am Realty Inv., Inc.,* 2007 WL 1302742, *2 (E.D.Cal. May 2,

2007).

Generally, where harm can be addressed through monetary damages, a preliminary injunction is not warranted. *Shammel v. Canyon Resources Corp.*, 2003 MT 372, ¶17; *Lough v. Bount*, 336 F. Supp. 627, 628 (D. Mont. 1971). However, Montana has carved out an exception where there is evidence that the defendant could be "judgment proof" and the plaintiff would be left without a sufficient remedy absent the injunction. *Shammel*, ¶17; *Van Loan v. Van Loan*, 895 P.2d 614, 617 (D. Mont. 1995). The Montana standard is rooted in federal law. *Van Loan*, 895 P.2d at 615-616 (citing *Deckert v. Indep. Shares Corp*, 311 U.S. 282 (1940)); *see also* Charles A. Wright, Arthur Miller, Mary K. Kane & Richard L. Marcus, 11A *Fed. Prac. & Proc. Civ.* §2948.1 (2d ed.) ("risk that the defendant will become insolvent before a judgment can be collected, may give rise to the irreparable harm necessary for a preliminary injunction").

Where an injunction is sought on this basis, the moving party has the obligation to establish the following:  (1) likelihood of success on the merits; (2) likelihood of irreparable injury absent an injunction; (3) a balancing of the equities; and (4) the injunction, if issued, would not be adverse to the public interest. *Shammel,* ¶17.  These elements exist on a continuum, where the strength of one can mitigate against the weakness of another:

> (1)  a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor.  These are not two distinct tests, but rather the opposite ends of a single

> "continuum in which the required showing of harm varies inversely
> with the required showing of meritoriousness."

*Van Loan*, 895 P.2d at 616 (quoting *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir. 1988)).  This sliding scale approach is still applied today in federal courts.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).  The evidence establishes all of the elements here.

**B.    BP Is Entitled To A Preliminary Injunction**

    **1.    Likelihood Of Success/Serious Questions Going To The Merits.**

        ***a.    Masters is in breach of a valid and enforceable contract.***

If the Agreement between Masters and BP is enforceable, there is no question that Masters is in breach.  Masters admits that she has not paid BP any of the money or transferred any of the property she has received or is to receive under the settlement agreement with Scrantom.  SUF¶¶101.  While Masters has asserted the full panoply of contract avoidance theories, BP is entitled to summary judgment on those theories.  *See* Dkt. 69.  BP incorporates its Brief in Support of Partial Summary Judgment on these defenses to demonstrate a likelihood of success on the merits of those contract avoidance defenses.  Dkt. 70-1.

        ***b.    There is a likelihood that BP will succeed on the merits of Masters' counterclaims.***

Masters has also asserted a number of affirmative claims against BP seeking monetary damages.  Many of these claims are just the contract avoidance defenses

restated as affirmative claims for damages.  *See e.g.* Dkt. 6, Counterclaim. III & V (champerty & usury); Dkt. 45-1, Counterclaim. IX & XI (maintenance & fraud).[4] To that extent, BP's motion for summary judgment already addresses those claims. Moreover, for champerty and maintenance, the Ninth Circuit has held that the theory is at most a contract defense, not an affirmative cause of action.  *Del Webb Comn. v. Partington*, 652 F.3d 1145, 1154 (9th Cir. 2011).

Masters' affirmative claims against BP are based on two interrelated factual contexts:  (i) BP's decision not to offer additional funding to Masters beyond the $310,435 Budget incorporated into the Agreement; and (ii) BP's involvement, through Napp, in strategy and substantive decisions in the Divorce.  Under both contexts, Masters contends that BP caused her to have to accept an inadequate settlement for her to live on – with $4.2 million being inadequate – rather than go to trial in the Divorce.  Depo. Lila Masters Vol. I, 76-77, 266-268 (Oct. 2, 2012) (attached as Ex. A to the Foundational Aff. Kjelsrud filed contemporaneously).

Even taken at face value, this notion is absurd, given that Masters is to receive cash and shares of stock under the settlement agreement valued in excess of $4 million and, prior to BP's funding, Masters admits that Scrantom had offered

---

[4]     As part of her Preliminary Pretrial Statement, Masters attached a proposed Amended Third-Party Complaint (Dkt. 45-1).  However, she has not yet filed the pleading, which means that the initial pleading (Dkt. 6) is the operative one.  To the extent it is germane to the instant motion, BP will attempt to address those proposed new claims as well.

8

her nothing in the Divorce.  SUF¶13.  Furthermore, it should be noted that Masters is asserting that her contract with BP is invalid while simultaneously alleging that BP did not do enough under the Agreement to assist her.  While procedurally she is allowed to plead in the alternative, the inconsistency of these positions is a testament to the lack of credibility of her claims.

Nevertheless, BP submits that there is a strong likelihood it will prevail on the merits of these affirmative claims.  At a minimum, there are serious questions regarding whether Masters will be able to establish liability, which, coupled with a balance of the hardships, tips in favor of BP.

### c.    *BP had no obligation to increase its funding.*

Claims based upon BP's decision not offer additional funding beyond the $310,435 should fail on a number of grounds.  First, to the extent that Masters asserts that BP's decision constitutes a breach of either the express or implied terms of the Agreement, that affirmative claim is barred so long as she herself is admittedly in material breach of that same contract.  *AAA Constr. of Missoula, LLC v. Choice Land Corp.*, 2011 MT 262, ¶30 ("Waynco correctly notes that Montana law prevents a party in material breach from maintaining a breach of contract action against the other contracting party").  A material breach is "one that touches the fundamental purpose of the contract and defeats the object of the parties in making the contract."  *R.C. Hobbs Ent., LLC v. J.G.L. Dist., Inc.*, 2004 MT 396,

¶33.  There can be no argument that failure to pay BP any of the money and property owed under the Agreements constitutes material breach.  This breach by Masters is in addition to other breaches committed by Masters during the funding period, where she failed to cooperate with BP and her own attorneys in the prosecution of her claims.  SUF¶85.

Presumably to get around this prohibition, Masters alternatively alleges (or indicates that she intends to allege) a number of tort and statutory claims, like the Montana Consumer Protection Act ("MCPA"), arising out of these same facts.  But these claims are all based upon what were Masters' reasonable expectations in the business transaction with BP.  Mont. Code Ann. §30-14-103 (prohibiting "unfair or deceptive acts or practices"); *Pfau v. Mortenson*, 858 F. Supp. 2d 1150, 1158 (D. Mont. 2012) (identifying a "reasonable reliance" on a representation as an element of fraud).  Montana law does not provide protection or a cause of action for unreasonable expectations.

The Agreement itself only obligates BP to provide funding "up to the aggregate amount of $310,435.00" for the items specified in the Budget.  SUF¶62.  The Agreement also states, "Balance Point shall have no obligation to make disbursements in respect of funding request that exceeds the sums set forth in the Budget."  SUF¶64.  Likewise, the Budget itself states that it can only supplemented in writing, executed by BP and Masters.  SUF¶64.  These express contractual

provisions set the reasonable expectations of the parties, so BP's decision not to amend the contract to increase that amount is not actionable. *Hardy v. Vision Serv. Plan*, 2005 MT 232, ¶15 (decision not to extend contract beyond express term did not deprive party of reasonable expectation).

Second, prior to entering the Agreement, Masters was advised by one of her lawyers that there was no obligation by BP to increase its funding nor was there any guarantee that the Divorce could be taken to trial within the Budget. SUF¶49B.  Finally, Masters admits that at no time did BP represent–nor did she believe–that she had a "blank check" for BP to increase its funding above $310,435.  SUF¶65.

Masters' case is based upon statements by Napp that BP would, "be with Masters through the conclusion of the Divorce."  This statement is not a commitment of unlimited funding.  Moreover, the evidence will show that BP actually tried to continue to assist Masters in non-monetary ways, but Masters rejected these efforts and pushed BP away because she was angry with BP as Masters wanted more money and BP declined to offer additional funding.  Decl. Napp ¶51.  BP also paid approximately $1,300 in shipping costs for Masters, despite having exhausted its funding, just so Masters' lawyers could prepare for trial.  SUF¶85.  Masters has no basis to complain that BP misrepresented the extent of its financial commitment or that she was unaware of the limits of that extent.

11

### d.   *BP was justified in being substantively involved in the Divorce strategy.*

The second factual basis for these claims–the level of Napp's involvement in the Divorce–will likewise be insufficient to establish a cause of action.  First, as an initial matter, there is no provision in the Agreement that prohibits BP's substantive involvement in the Divorce.  On the contrary, the Joint Defense/ Joint Prosecution Agreement between BP and Masters, attached as Exhibit H to the Agreement expressly allows for the "joint prosecution" and "sharing of thoughts, analyses and impressions of the Parties and their counsel and coordination of law and motion efforts."  SUF¶37D.  BP had a contractual right to actively participate in the Divorce strategy.  Masters can hardly complain about BP's involvement when it was not prohibited by the contract (*Hardy*, ¶21).

Furthermore, the evidence will show that Masters specifically *requested* Napp's increased involvement and then repeatedly thanked her and BP for it.  When Masters first contacted BP, her two lawyers, Ron Waterman and Mark Mason were fighting and not even talking with each other.  SUF¶24.  On February 17, 2011–before BP had even offered a funding contract to Masters– Masters wrote to Napp, forwarding terse correspondence between Waterman and Mason and wrote, "This is becoming hostile so I would love to discuss strategy with you."  Decl. Napp at Ex. D.

Masters also wanted to terminate one of her lawyers (Waterman) (SUF¶25) and asked BP to assist her with finding another lawyer to either replace or supplement him (Decl. Napp ¶20).  Throughout the Divorce, Masters specifically asked that BP have extensive involvement in the Divorce (Decl. Napp ¶49; Ex. K) and she repeatedly thanked BP and Napp specifically for their assistance and involvement:

> "Thank you, Stacey.  You have been a real treasure in my life this past year.  I will always be grateful."
>
> "I [Masters] am grateful for all you [Napp] have done for me this Thanksgiving."
>
> "You [Napp] have been a blessing in my life and for that I [Masters] will always be grateful.  Remember that you and your company provided hope and refuge for this old lady."

SUF¶75A-C.

Moreover, BP owned a 25% interest in the marital claims asserted in the Divorce by investing $310,435, which provides BP a privilege to be involved in that proceeding to protect its own interests.  *Phillips v. Mont. Ed. Assn.*, 610 P.2d 154, 158 (Mont. 1980).

Masters now alleges that BP actually took over the strategy in the Divorce, requiring her to hire expensive out-of-state counsel (David Parker) and directing her lawyers to file a number of unsuccessful motions for disqualification of the Standing Master and Scrantom's counsel, wasting the funding BP had committed.

Then, when the funding was exhausted, BP instructed these same lawyers to settle the case rather than take their chances at trial.  These allegations by Masters are pure fantasy.

First, it is not as if the Divorce had been prosecuted collegially and cost-effectively prior to BP's funding.  On the contrary, it had been expensive and acrimonious, with sixteen separate motions for contempt and two failed mediations.  *See* First Decl. Kjelsrud at Ex. B (Dkt. sheet from the Divorce).  In fact, despite incurring over $350,000 in attorneys' fees prior to BP's involvement, Scrantom had not made a single settlement offer.  SUF¶13.

Second, BP's funding was not tied to the hiring of any counsel within the state of Montana or outside Montana.  Nothing in the Agreement requires specific counsel and Masters admitted that BP's funding was not tied to her retaining any specific lawyer.  SUF¶41.  Instead, Ms. Masters had the sole and exclusive authority under the Agreement to hire her own counsel.  Decl. Napp ¶22.

Third, due to her own dissatisfaction with Waterman (SUF¶25), Masters asked BP to inquire of four separate Montana counsel (some of whom had previously represented her in her divorce) if they would be willing to take her on as a client.  All four declined.  Decl. Napp ¶20.  It was at this point that BP referred Masters to Parker for consideration to add to her team.  Decl. Napp ¶21.  Contrary to her unsubstantiated allegations, there was no prior relationship between Parker

14

and BP.  SUF¶40.  Masters herself decided to retain Parker after a phone interview and voluntarily executed his engagement agreement where she agreed to his higher hourly rate.  SUF¶47.

Fourth, at the time the Budget had been made and BP had committed to its maximum funding, the events that lead to the disqualification motions in the Divorce had not yet occurred and were not reasonably foreseeable.  SUF¶77-79.  Further, Masters bears a large part of the responsibility for need for the disqualification motions.  These motions were precipitated by Scrantom breaking into a closet and taking privileged documents.  SUF¶77.  However, Masters had previously misrepresented to her attorneys and BP that the closet only contained her clothing and her personal property and not privileged or confidential documents.  Decl. Parker ¶12; Decl. Napp ¶45.  It was Masters' lawyers, Waterman and Parker, who due to the extraordinary circumstances, advised the filing of the disqualification motions.  SUF¶79.

Fifth, there is no evidence–other than Masters' own claims–that it was BP alone that directed the filing of these motions.  Instead, the strategy was collectively discussed, with the final decision being Masters.  Decl. Napp ¶46-47, Decl. Parker ¶16.  These decisions were not made lightly by any of the individuals involved.  Decl. Napp ¶46; Decl. Parker ¶15.  For Masters to imply that she was not involved or in favor of these decisions is wholly inaccurate.  Indeed her own

15

correspondence at this time shows she firmly supported the strategy collectively

agreed upon:

> I am not willing to engage any threatening conversations at any level
> and believe we need to push forward on the disqualifying motions.  I
> am willing to do an affidavit but probably ignoring Tim really puts
> him to the test

Decl. Napp at Ex N (Masters email (Dec. 8, 2011)).  In fact, Masters wanted to go

even further and file a complaint with the Commission on Practice against both

Special Master Bowen and District Judge Holly Brown.  BP, Waterman and Parker

talked her out of that course of action.  Decl. Napp ¶47.

Sixth, there is no incentive for BP to waste its funding on useless and

counterproductive motions.  BP has no reason to advance a strategy in the Divorce

that is contrary to Masters' interest in maximizing her claims; the greater the

recovery by Masters, the higher the value of BP's 25% interest.  Many of the

claims being asserted by Masters require that BP have some kind of malicious

intent toward Masters.  *See e.g. Phillips*, 610 P.2d at 157 (tortious interference

requires "unlawful and malicious acts of the defendant").  There is simply no

evidence of such counterproductive, irrational business intent by BP.

Finally, BP had nothing to do with the settlement agreement between

Masters and Scrantom.  The settlement was the result of Masters herself reaching

out to Scrantom, without BP's and at least Parker's knowledge, and soliciting an

offer from him in April of 2012.  SUF¶92.  Masters' acceptance and execution of

the settlement took place within the narrow confines of one day, April 18, 2012, when she, Waterman and Parker discussed the merits of the offer at a meeting the day before trial was scheduled to begin.  SUF¶89-90.  BP had no involvement in that meeting.  SUF¶92.

Importantly, BP was not even aware that a settlement offer was being considered by Masters until after Masters had signed it.  SUF¶92. There is no evidence that any of Masters' lawyers even discussed the settlement offer with BP prior to Masters' execution, nor could they as Napp was unavailable during the relevant time frame.  Decl. Napp ¶57.  Indeed, Napp only learned of the settlement *after* Masters had already executed it and was surprised, as she believed that the Divorce was going to trial.  SUF¶92

e.   ***Masters failed to mitigate her speculative damages.***

Regardless of whether the facts actually establish Masters' claims, she has undoubtedly failed to mitigate her alleged damages, which are based upon what she believes she would have received had she gone to trial in the Divorce. Notwithstanding exhaustion of BP's funding in mid-January, Masters always had the option of still going to trial instead of settling with Scrantom.  Both Waterman and Parker informed Masters that they were ready and willing to take her case to trial, with payment of their fees to be resolved out of the judgment and property awarded.  SUF¶87.  Indeed, that is why Masters, Waterman and Parker had

scheduled a meeting for April 18th and why Parker had flown into Montana from Los Angeles: to prepare for the upcoming trial.  SUF¶89.  Moreover, Parker advised her not to settle and told her specifically that she had the option of going to trial.  Decl. Parker ¶24.  Much like her decision to execute the contract with BP, it was Masters who then voluntarily decided to execute the settlement agreement although she had been repeatedly advised by her counsel that she had the option not to.  *Id.*

To make matters even more compelling, even after executing the settlement agreement, Masters subsequently had the opportunity to rescind the agreement she now claims is inadequate and that she was forced into when Scrantom breached the agreement by failing to make the first payment on June 1, 2012.  SUF¶95.  At that point, Masters had the ability to rescind the agreement and go to trial and was advised of this in writing by both Waterman and Parker.  Decl. Parker ¶28.  Despite this advice from Waterman and Parker she refused to speak with them, directed the funds go directly to her, not Waterman and accepted the late and reduced payment from Scrantom without complaint.  Depo. Masters Vol. I, 45:21-46:2.  If Masters' alleged damages are what she expected to receive going to trial, she twice had the opportunity to go to trial and not settle, notwithstanding the exhaustion of BP's funding.

Even so, Masters' belief that, had she gone to trial, she would have secured a higher recovery is –at best – rote speculation and contrary to public policy.  In Montana, damages which are speculative are not recoverable.  *Stensvad v. Miners & Merchants Bank of Roundup*, 640 P.2d 1303 (Mont. 1982)  (the prohibition against speculative recovery applies not to the amount of damages, but rather whether such damages would have been derived at all).  There was no guarantee that, had Masters gone to trial, she would have recovered anything more than what she agreed to under the settlement.  Indeed, Masters admitted she could have received less, as that is the nature of litigation.  Depo. Masters Vol. I, 79:25-80:4.

The fact that the Divorce Court accepted the settlement agreement suggests that the Court felt it was a fair and equitable disposition of the marital estate.  Any settlement agreement in a divorce is subject to approval by the Court, who can reject or modify it if it is unconscionable.  Mont. Code Ann. §40-4-201(3).  Clearly, the Divorce Court did not reach that conclusion.

The damages Masters is seeking to recover in this case are actually contrary to public policy.  "[T]he declared public policy of Montana 'encourages settlement' to 'avoid unnecessary litigation.'"  *Pallister v. Blue Cross & Blue Shield of Mont.*, 2012 MT 198, ¶6 (Morris, J. dissenting) (quoting *Augustine v. Simonson*, 940 P.2d 116, 120 (Mont. 1997)).  This importance of this public policy is even greater in the divorce setting:

> An important aspect of the effort to reduce the adversary trappings of marital dissolution is the attempt, made by Section 306 [40-4-201] to encourage the parties to reach an amicable disposition of the financial and other incidents of their marriage.  This section entirely reverses the older view that property settlement agreements are against public policy because they tend to promote divorce.  Rather, when a marriage has broken down irretrievably, public policy will be served by allowing the parties to plan their future by agreeing upon a disposition of their property, their maintenance, and the support, custody, and visitation of their children.

Commn. Note, Mont. Code Ann. §40-4-201.  The reasons for this policy are to eliminate cost, prevent stress that accompanies litigation, and to preserve judicial resources.  *Pallister*, ¶61.  Furthermore, settlement frequently provides a more equitable outcome (*Id.*), which is the underlying basis for property distribution in divorce cases anyway.  Mont. Code Ann. §40-4-202(1) (providing that the Court shall "equitably apportion" the marital property).

### 2.     Irreparable Injury.

The irreparable injury here is that, at Masters' historic and current pace of spending (her unwillingness or inability to live by any financial budget be it from BP or in her own personal life) and the unknown status of shares of Juridica and the Home, it is likely that she will be unable to satisfy even a substantial portion of a future judgment in favor of BP.  Montana law allows for a preliminary injunction when "the adverse party is doing or threatens or is about to do or is procuring or suffering to be done some act in violation of the applicant's rights, respecting the subject of the action, and tending to render the judgment ineffectual."  Mont. Code

Ann. §27-19-201(3) (cited in *Van Loan*, 895 P.2d at 616).  In *Van Loan*, the

Montana Supreme Court held that irreparable harm is demonstrated where there is

the potential for significant damages and the defendant has threatened to move

assets or dissipate them to avoid execution.  *Van Loan*, 895 P.2d at 617-618.  In

*Shammel*, the Court held irreparable harm was demonstrated where it appeared that

most of the funds that would go to satisfy a judgment were pledged to other

parties.  *Shammel*, ¶22 ("Canyon's money appears to be obligated everywhere

except Montana").

Here, the same irreparable harm is apparent.  Using the valuation provided

by Scrantom in the settlement agreement (SUF¶91), BP's 25% share would total

$1,077,500, not counting any revenues she ultimately receives from "case

investments" made by Scrantom's company, Juridica.  SUF¶91.  Masters does not

currently have cash and property to fully satisfy such a judgment.  The Juridica

shares still have not been transferred and they remain outside of the Court's

jurisdiction.  SUF¶100.  Likewise, Masters is not undertaking any efforts to pursue

Scrantom for his breach of the settlement agreement.  SUF¶104.

Furthermore, at Masters' current rate of spending, BP is unlikely to be able

to recover even its base investment of $310,445, let alone its attorneys' fees, which

are recoverable under the Agreement.  SUF¶36C.  Masters took $510,000 of the

initial payment by Scrantom and applied it to the purchase of a home.  SUF¶98.

While BP claims a constructive trust on the property and has filed a *lis pendens* (Dkt. 36), that does not ensure that BP will be able to execute in a first position should it need to in order to satisfy the judgment, especially given that Masters wants to provide to Mason a $270,555.35 mortgage on the Home.  *See* Dkt. 39-1 ¶3.

Masters' economic situation is even more precarious due to the fact that she owes so many other lawyers who represented her in the Divorce, not including Mason.  SUF¶102 (indicating approximately $144,000 in outstanding, unsettled legal fees)

Additionally, despite her agreement to reign in her spending to $15,000 per month (Dkt. 21), the math indicates that she is burning through money at close to twice that rate.  SUF¶¶105-106.  If Masters' spending is not brought under control through an injunction, BP will suffer the irreparable harm of having a judgment that is ineffectual.  Other than some part-time consulting, Masters is unemployed (Depo. Masters Vol. I, 10:17-20) and, based on her bank account statements, appears to spend her time traveling and dining out on a regular basis (Decl. Napp ¶65).  Other than the shares and cash payments made pursuant to the settlement agreement in the Divorce, she has no other realistic source of income to pay a judgment to BP.

     3.     **<u>Balancing Of The Equities</u>.**

In balancing the equities, the Court is to weigh the potential damage to the movant against any damages claimed by the non-moving party.  In *Van Loan*, the Court held that the balance of the equities tipped in the movant's favor because the non-movant was in prison for at least the next ten years, so freezing his assets would not cause him any damage because he had no expenses.  *Van Loan,* 895 P.2d at 618.  In *Shammel*, the injunction only applied to sale proceeds from mining properties in the state of Montana and the Court found that Canyon Resources still had sufficient income from other sources for operating income.  *Shammel*, ¶24.

The analysis here is similar to *Shammel*, in that BP is not seeking to freeze all of Masters' assets, but rather curb her spending and eliminate the risk that she will encumber any assets further that might be used to satisfy a judgment.  Like the operating income still available for Canyon Resources in *Shammel*, with a limit of $15,000 per month, no mortgage, no car payments and no contribution towards her two children (SUF¶107), Masters should have ample income to meet all of her reasonable needs, *including* reasonable attorneys' fees, on a monthly basis.

In her affidavit Masters states, "I currently have monthly living expenses and I am incurring significant attorneys' fees associated with this litigation and for separate counsel in Montana relating to my divorce proceedings."  Dkt. 57-2, ¶2. Masters provides no detail regarding either claim and, frankly, they ring hollow. BP cannot even understand why Masters needs $15,000 per month, as she has very

limited mandatory expenses.  Since she paid cash for the Home (SUF¶98, 107),

Masters does not have a mortgage payment.  Her children have all grown and do

not live with her, so admittedly she does not financially support either of them

(SUF¶107) nor does she pay any monthly premium for medical insurance. Finally,

the large payments she receives from Scrantom under the property settlement are

tax free (IRC §1041(a)), so her tax burden should be easily manageable.

The injunction that BP is seeking would allow Masters to expend up to

$180,000 tax-free dollars annually without further leave of the Court.  The vast

majority of the population in Montana raises families and pays their mortgages and

bills with far less even after paying taxes.  BP cannot understand how a single

woman, with few mandatory expenses cannot find a way to live on $180,000 a

year tax-free.  The reason is clear, Masters likes to spend lots of money on

discretionary expenses, like traveling, dinning out and shopping trips to Neiman

Marcus.  Decl. Napp ¶65.  In fact, in one single excursion to a sunglass retailer in

Vail, Colorado, Masters spent $1,133.00!  1st Kjelsrud Decl. Ex. D-56.  In

balancing BP's right to ensure a collectible judgment, Masters' discretionary

consumption does not come close to tipping the equities in her favor.

Presumably, Masters will argue that she still has legal expenses in this

litigation and in her Divorce which would weigh against the injunction BP seeks.

BP has three responses.  First, these are discretionary expenses, as it was Masters

decision not to pay BP which necessitated this litigation.  Second, Masters has

already paid her current counsels $70,000 in the aggregate.  A $30,000 retainer in

August to Mr. Shea and a $40,000 retainer to Ryan Jackson, in June.  SUF¶103.

Jackson, who received the $40,000 retainer, has not even filed an appearance in the

Divorce and seems to be doing little to ensure that Masters receives the payments

(at least approximately $71,000 already) that Scrantom has failed to make other

than write a few demand letters.  SUF¶104.  As such, BP questions the veracity of

Master's conclusory affidavit.  Absent actual evidence (i.e. invoices from counsel),

the $70,000 in retainers that Masters has already paid should be ample at this time.

Finally, Masters always retains the ability to come back to the Court for

leave to expend more than the $15,000 limit under the injunction.  However,

without an injunction in place, Masters operates in a way that indicates that she

believes she has *carte blanche* to expend as much as she would like, despite a

funding budget or her agreement in the Notice.  Without an injunction backed by

the power of the Court, her out of control spending will dissipate the very assets

which are the subject of this litigation.

### 4.    <u>The Public Interest</u>.

The injunction which BP seeks would not be adverse to the public interest

because public policy supports ensuring the prompt payment of judgments issued

in a civil action and the payment of obligations.  *Van Loan*, 895 P.2d at 618;

*Shammel*, ¶25.  Moreover, BP is only one of numerous creditors that need to be paid by Masters, specifically the very lawyers that represented her in the Divorce. SUF¶102.  Even if BP is paid a judgment in full, making sure that there are still funds available to pay these folks that labored on Masters' behalf is in the public interest.

### III.  <u>CONCLUSION</u>

For the foregoing reasons, BP requests that the Court deny Masters' motion to be relieved of any pre-notice obligations on her expenditures (Dkt. 57), but rather issue a preliminary injunction in this matter with the specific parameters requested by BP.

DATED this 12th day of December, 2012.

/s/  Charles E. Hansberry
Attorneys for Plaintiff Balance Point
Divorce Funding, LLC

26

CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(d)(2)(E), I certify that this PLAINTIFF'S BRIEF IN

SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND IN

OPPOSITION TO DEFENDANT'S MOTION FOR RELIEF OF COURT

NOTICE OBLIGATIONS (DKT. 57) is printed with proportionately spaced Times

New Roman text typeface of 14 points; is double-spaced; and the word count,

calculated by Microsoft Office Word 2010, is 6,233 words long, excluding

Caption, Certificate of Service and Certificate of Compliance.


/s/  Charles E. Hansberry
Attorneys for Plaintiff Balance Point
Divorce Funding, LLC

27

1309930