Charles E. Hansberry
Jeffrey M. Roth
GARLINGTON, LOHN & ROBINSON, PLLP
350 Ryman Street • P. O. Box 7909
Missoula, MT  59807-7909
Telephone (406) 523-2500
Telefax (406) 523-2595
cehansberry@garlington.com
jmroth@garlington.com

Attorneys for Plaintiff and Counter-Defendant

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| BALANCE POINT DIVORCE FUNDING, LLC, a Nevada Limited Liability Company, on behalf of itself and as the managing member of BALANCE POINT FUNDING NUMBER I, LLC, a Delaware Limited Liability Company | Cause No. CV-12-40-BU-SEH |
| Plaintiff, | |
| v. | PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |
| LILA MASTERS, | |
| Defendant, Counterclaimant, Third-Party Plaintiff, | |
| v. | |
| JOHN DOES 1-5, and JANE DOES 1-5, | |
| Defendants, | |
| v. | |
| STACEY NAPP, Third-Party Defendant. | |

TABLE OF CONTENTS

Page

I.     Introduction...................................................................................2

II.    Factual and Procedural Background.............................................2

III.   Legal Analysis ..............................................................................8

       A.    Preliminary Injunction Standards .........................................8

       B.    Confidentiality:  The Court Should Enjoin Masters from
             Disseminating the Purchase Agreement.............................10

             1.     The Court Should Enjoin Masters Pursuant to the
                    Confidentiality Agreements ......................................11

                    a.     Success on the Merits ....................................11
                    b.     Irreparable Harm............................................14
                    c.     Balancing of the Equities................................18
                    d.     Public Interest ...............................................18

             2.     The Court Should Enjoin Masters Because the Purchase
                    Agreements are Trade Secrets. ................................19

                    a.     Success on the Merits ....................................19
                    b.     Irreparable Harm............................................21
                    c.     Balancing of the Equities................................22
                    d.     Public Interest ...............................................22

       C.    Spending:  The Court Should Enjoin Masters from Exceeding the
             Spending Limit As Set Forth in the Stipulation She Filed with this
             Court ................................................................................23

             1.     Success on the Merits.............................................23
             2.     Irreparable Harm....................................................24
             3.     Balancing of the Equities .......................................27
             4.     Public Interest .......................................................28

IV.    Conclusion ..................................................................................29

CERTIFICATE OF COMPLIANCE........................................................31

TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ........................................................9

*Erie R.R. Co. v. Tompkins*,
    304 U.S. 64 (1938).......................................................................8

*Felska v. Goulding,*
    238 Mont. 224, 776 P.2d 530 (1989)...................................... 13, 23

*Four Rivers Seed Co. v. Circle K Farms, Inc.*,
    2000 MT 360, 303 Mont. 342, 16 P.3d 342 .......................... 16-17

*Lough v. Bount*,
    336 F. Supp. 627 (D. Mont. 1971) ..............................................10

*Shammel v. Canyon Resources Corp.*,
    2003 MT 372*,* 319 Mont. 132, 82 P.3d 912 ................................ 9-10, 25, 28

*Sims Snowboards, Inc. v. Kelly*,
    863 F.2d 643 (9th Cir. 1988) .................................................... 8-9

*State v. Shepard*,
    2010 MT 20, 355 Mont. 114, 225 P.3d 1217 ........................ 13, 23

*The Fansler Found. v. Am. Realty Inv., Inc.,*
    2007 WL 1302742 (E.D. Cal. May 2, 2007)..................................9

*Van Loan v. Van Loan*,
    271 Mont. 176, 895 P.2d 614 (1995)............................9-10, 25-26

**Statutes**

Mont. Code Ann. § 27-19-201(2) (2011) ..................................9

Mont. Code Ann. § 27-19-201(3) (2011) ..................................9

Mont. Code Ann. § 30-14-401 ................................................19

TABLE OF AUTHORITIES - CONT'D

**Statutes**                                                       Page

Mont. Code Ann. § 30-14-402(2)(b)(ii)(B) (2011) ..................................19

Mont. Code Ann. § 30-14-402(4) (2011) ...............................................20

Mont. Code Ann. § 30-14-403 (2011) ...................................................20

Mont. Code Ann. § 30-14-404 (2011) ...................................................19

**Other Authorities**

Charles A. Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus,
    11A *Fed. Prac. & Proc. Civ.* § 2948.1 (2d ed. Dec. 2012)..................................10

Fed. R. Civ. P. 65 ............................................................................8

1352978

## I.   Introduction

Plaintiff Balance Point Divorce Funding, LLC ("Balance Point") respectfully files this motion for a preliminary injunction against Defendant Lila Masters ("Masters").  The Court should enjoin Masters in two respects:  first, the Court should enjoin Masters from disclosing the Purchase Agreements she entered with Balance Point pursuant to the terms of the Confidentiality Agreements, which she and counsel executed; and second, the Court should enjoin Masters from exceeding the spending limits as set forth in her written stipulation filed with this Court.  Balance Point sets forth the merits of these arguments below.

## II.   Factual and Procedural Background

This litigation involves a dispute between Balance Point, a third-party litigation funding company, and Masters, its client.  Masters entered two separate funding agreements with Balance Point:  an initial Purchase Agreement dated May 24, 2011 and a First Amended and Restated Purchase Agreement dated September 29, 2011 ("Purchase Agreement").  Depo. Lila Masters Vol. I, 255:6-12 (Oct. 2, 2012), excerpts attached hereto as Ex. A; Vol. II, 45:6-46:25; 68:2-4 (Nov. 14, 2012), excerpts attached hereto as Ex. B.  Under the Purchase Agreement, Balance Point provided Masters $310,435 as consideration for a 25% interest in her claims to marital property asserted in the dissolution proceedings ("Divorce") with her husband, Tim Scrantom ("Scrantom").

Masters also executed two contracts with Balance Point that coincided with her entry into the Purchase Agreements. These contracts, or Confidentiality Agreements, addressed the confidential and proprietary nature of the Purchase Agreements, and they were conditions precedent to Masters receiving any offer of funding from Balance Point and access to the Balance Point Purchase Agreements. Masters executed the first Confidentiality Agreement on April 27, 2011. *See* Apr. Confidentiality Agr. ("Apr. Agr."), attached as Ex. C. She executed the September Confidentiality Agreement on September 19, 2011. *See* Sept. Confidentiality Agr. ("Sept. Agr."), attached as Ex. D. In each instance, she had independent legal counsel who provided her pertinent legal advice regarding the Confidentiality Agreements, and then co-signed the agreements with her. The terms of the Confidentiality Agreements barred Masters and her attorneys from disclosing the contents of the Purchase Agreements.

In April 2012, Masters settled her Divorce. Under the terms of the settlement agreement for the Divorce, Scrantom is required to pay Masters $2,305,000 million in cash over time and transfer $2,005,000 in stock to her. *See* Depo. Masters Vol. I: 147:9-148:12. On June 14, 2012, Scrantom made an initial payment of $719,000. *Id.* at 45:25-46:4. In July, Scrantom also paid Masters $41,664, which was the first quarterly payment owed under a promissory note for $1.5 million. *Id.* at 103:15-21. Masters testified that Scrantom has breached the

3

settlement agreement because he has not paid the remainder of the initial payment ($31,000) and he also failed to make the second quarterly payment of $41,664 on the promissory note. *Id.* at 45:25-46:4; 103:15-21; 108:3-16. Balance Point understands Scrantom may have made a subsequent quarterly payment, and that Masters may now be attempting to enforce her settlement rights from the Divorce settlement.

Since the conclusion of her Divorce settlement, Masters has denied she has any contractual obligations to Balance Point under the Purchase Agreement. Masters does not dispute that she has not paid Balance Point as required under the Purchase Agreement. *Id.* at 105:17-23. Significantly, Masters is quickly spending the money she has received from Scrantom at a pace that threatens Balance Point's ability to recover the funds due under the Purchase Agreement (Masters has no other source of significant income or assets). For example, shortly after receiving the first payment of $719,000, Masters depleted her cash by $505,000 to pay for an up-scale home in Bozeman, Montana. *Id.* at 96:10-14; *see also* Dkt. 36.

Initially, Balance Point felt it might need to seek injunctive relief from the Court in order to protect its 25% interest and sought to move quickly to conduct the necessary discovery to make such a motion. Balance Point scheduled Masters' deposition in order to support a potential injunction. Masters' sought a protective order, seeking to block the scheduled depositions. *See* Dkt. 18. The Court held a

phone conference on the matter and advised the parties to work out their dispute

over the scheduled deposition.  In response to this dispute and the Court's

admonition regarding the deposition, Masters filed the notice of agreement

("Spending Agreement") with the Court (Dkt. 21) on September 5, 2012:

> The attorneys came to an agreement that Lila Masters will not to
> expend [sic], transfer or otherwise dissipate any of her assets that she
> is in possession of or is to receive under her property settlement
> agreement in the underlying divorce litigation pending further order of
> this Court.  Further it was agreed that Ms. Masters would be permitted
> to expend up to $15,000 per month in living expenses pending further
> Order from this Court.

Dkt. 21.  In reliance on the Spending Agreement, Balance Point reasonably

believed that Masters would comply with the spending cap and thus did not follow

through with its scheduled deposition and intention to file the motion for an

injunction.  Masters then filed an additional notice to the Court, *see* Dkt. 23,

advising the Court there was no need for the scheduled September 12th hearing on

Masters' motion for a protective order.  Balance Point expected it could reply upon

the agreement Masters filed with this Court.

Balance Point has since learned that Masters has not complied with the

terms of the Spending Agreement.  To the contrary, she is spending money at a

pace that far exceeds the $15,000 per month limit she agreed to in the Spending

Agreement.  Dkt. 2).  On September 24, 2012, the balance in Masters' two bank

accounts had been $143,742.  Depo. Masters Vol. II, 100:6-16.  Masters testified

that, as of November 9th, she only had approximately $61,780 remaining, indicating she expended $81,962 in just 47 days. *Id.* For comparison, if Masters had complied with the filed limit of $15,000 a month, she should have only expended around $23,500 over that period of time. She spent $40,000 of the $81,962 on a payment for legal fees. *Id.* That means she still expended almost $42,000 in 47 days, which is quite substantial for a person who does not have a mortgage, a car payment, and who admittedly does not financially support her two adult children. Depo. Masters Vol. I, 14:10-13. This example of Masters' spending habits is exactly why the Spending Agreement exists.

Notably, Masters filed a motion seeking relief from the $15,000 spending limit. Dkt. 57. The Court subsequently denied the motion as moot. Nonetheless, not only has Masters confirmed that she will not abide by the requirements of the agreement she filed, but she now has asked the Court to relieve her of the agreement she filed and breached.

Balance Point also recently confirmed that Masters failed to comply with the Confidentiality Agreements. In fact, Masters personally sent a copy of Balance Point's Purchase Agreement to its potential competitor, Black Robe Capital ("Black Robe"), which is Scrantom's company. Then Masters lied about it under oath. Balance Point suspected that Masters had sent the Purchase Agreement to Scrantom and Black Robe Capital because Balance Point received discovery

documents that suggested Masters may have faxed the Purchase Agreement to

Scrantom.  It was unclear if this was the case, however, and under oath, Masters

explicitly denied she provided the Purchase Agreement to Scrantom or Black

Robe.  Depo. Masters Vol. II, 72:23-74:18.

Counsel repeatedly asked Masters about this point:

Q.    Did you fax a copy of the Balance Point agreement to your
      husband?

A.    No.

                            *    *    *

Q.    So you're going to stand by your earlier testimony that you
      never gave him a copy of the funding agreement?

A.    I never gave him a copy.  No.

*Id.* at 72:23-25; 73:24-74:2.

Balance Point has confirmed Masters perjured herself.  Pursuant to

subpoena, Black Robe provided irrefutable proof that Masters faxed the Purchase

Agreement to it.  *See* Decl. Stacey Napp, Ex. A:  Black Robe Capital Prod. (Mar.

3, 2013), attached as Ex. E.  In a series of two fax deliveries, Masters provided

Black Robe the entire Purchase Agreement with Balance Point.  *Id.*  Masters

emailed Scrantom to advise she was sending the second fax.  *Id.* ("faxing now-

please confirm when you receive 41 pages").  Every page of the September

Purchase Agreement that Masters faxed to Black Robe bears the hallmark of

Masters' name and cell phone number.  *Id.*

Tellingly, when Masters' answered Balance Point's Second Amended Complaint, Masters admitted to providing "a portion of the funding document to Scrantom."  Lila Masters' Ans. Def.'s 2d Amend. Compl. ¶ 56 (Jan. 28, 2013), Dkt. 114 ("Masters Ans.").  That is, in direct response to Balance Point's allegations for beach of the Confidentiality Agreements, Masters' pleading admits she provided the confidential materials to Balance Point's competitor and thereby admits she breached the Confidentiality Agreements.  Furthermore, now Masters herself has undeniably confirmed she committed perjury.

Based upon the foregoing factual and procedural background and the legal standards addressed below, Balance Point seeks to enjoin Masters from further violating the Confidentiality Agreements and the stipulated spending limit she filed with the Court.

### III.  Legal Analysis

**A.**    **Preliminary Injunction Standards.**

Because federal jurisdiction in this case is based upon diversity, the issuance of a preliminary injunction is a mixed question of federal and state law.  Although a preliminary injunction is procedurally provided under Federal Rule of Civil Procedure 65, the Court is to apply state substantive law under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Sims Snowboards, Inc. v. Kelly*, 863 F.2d 643, 647

(9th Cir. 1988); *The Fansler Found. v. Am. Realty Inv., Inc.,* 2007 WL 1302742 *2

(E.D. Cal. May 2, 2007).

Montana law provides for the imposition of an injunction when a party to

litigation faces the prospect of irreparable injury or an inability to recover under a

judgment due to the actions of the adverse party.  Mont. Code Ann. § 27-19-

201(2)-(3) (2011); *Van Loan v. Van Loan*, 271 Mont. 176, 181-182, 895 P.2d 614,

617 (1995); *Shammel v. Canyon Resources Corp.*, 2003 MT 372, ¶¶ 15-16, 319

Mont. 132, 82 P.3d 912.  A party seeking an injunction has the obligation to

establish the following elements:  (1) likelihood of success on the merits; (2)

likelihood of irreparable injury absent an injunction; (3) a balancing of the equities;

and (4) the injunction, if issued, would not be adverse to the public interest.

*Shammel*, ¶ 17.  These elements exist on a continuum, where the strength of one

can mitigate against the weakness of another:

> (1)  a likelihood of success on the merits and the possibility of
> irreparable injury, or (2) the existence of serious questions going to
> the merits and the balance of hardships tipping in its favor.  These are
> not two distinct tests, but rather the opposite ends of a single
> "continuum in which the required showing of harm varies inversely
> with the required showing of meritoriousness."

*Van Loan*, 271 Mont. at 181, 895 P.2d at 616 (quoting *Miss World (UK) Ltd. v.*

*Mrs. Am. Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir. 1988)).  This sliding scale

approach is still applied today in federal courts.  *Alliance for the Wild Rockies v.*

*Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Generally, courts do not favor preliminary injunctions where the harm alleged exclusively concerns monetary damages, but Montana courts recognize this is not an inflexible standard. *Shammel*, ¶ 17; *Lough v. Bount*, 336 F. Supp. 627, 628 (D. Mont. 1971). Rather, Montana courts impose preliminary injunctions where evidence shows the defendant could be "judgment proof" and the plaintiff would be left without a sufficient remedy absent the injunction. *Shammel*, ¶17; *Van Loan*, 271 Mont. at 181-182, 895 P.2d at 617. The Montana standard is rooted in federal law. *Van Loan*, 895 P.2d at 615-616 (citing *Deckert v. Indep. Shares Corp*, 311 U.S. 282 (1940)); *see also* Charles A. Wright, Arthur R. Miller, Mary Kay Kane & Richard L. Marcus, 11A *Fed. Prac. & Proc. Civ*. § 2948.1 (2d ed. Dec. 2012) ("risk that the defendant will become insolvent before a judgment can be collected, may give rise to the irreparable harm necessary for a preliminary injunction").

**B.    Confidentiality:  The Court Should Enjoin Masters from Disseminating the Purchase Agreement.**

There are two reasons the Court should enjoin Masters from any further disclosure of the Purchase Agreements. First, Masters executed two enforceable contracts, promising she would not provide the Purchase Agreements, or any other confidential materials, to anyone other than her attorneys who also signed the Confidentiality Agreements. The terms of those Confidentiality Agreements are binding as separate contracts. Additionally, pursuant to the Montana Trade Secrets

10

Act, the subject matter of the Purchase Agreements constitutes trade secrets, subject to protection under this Montana law.  Both bases provide compelling reasons to grant Balance Point's motion for a preliminary injunction.

1.     **The Court Should Enjoin Masters Pursuant to the Confidentiality Agreements.**

The Court should find the binding terms of the Confidentiality Agreements substantiate a basis to grant a preliminary injunction.  Balance Point fulfills all four of the necessary elements for this analysis.

a.     **Success on the Merits**

Count II of Balance Point's Second Amended Complaint sets forth the claim for Masters' breach of the Confidentiality Agreements.  2d Amend. Compl. 17-18 (Jan. 8, 2013), Dkt. 92.  Both the April and the September Confidentiality Agreements directly provide that Masters cannot disclose the terms and conditions of her funding agreements with Balance Point to anyone else other than her attorney or necessary employees of her attorney.  Apr. Agr. 1; Sept. Agr. 1.  The agreements forbid disclosure of this information in any form: orally, in writing, or otherwise.  Apr. Agr. 1; Sept. Agr. 1.  Among many other items, the agreements specifically forbid disclosure of the Purchase Agreements or the information therein.  Apr. Agr. 1; Sept. Agr. 1.

//

//

The April Confidentiality Agreement specifies:

> Watson [and Masters] further acknowledges and agrees that the
> unauthorized disclosure, use or disposing of the Confidential
> Information by it, its employees, its advisors and/or its agents could
> cause irreparable harm and significant injury to the Company [BP]
> that may be difficult to ascertain.  Accordingly, Watson agrees that
> the Company shall have the right to an immediate injunction in the
> event of any breach of this Agreement by Watson, its employees, its
> advisors and/or its agents, in addition to any other remedies that may
> be available to the Company at law or in equity.

Apr. Agr. 2.  The September Confidentiality Agreement contains an identical

paragraph except that it applies to attorney Ryan Jackson rather than attorney

Chuck Watson.  Sept. Agr. 2.  Masters signed both contracts, signifying "I AGREE

TO AND ACCEPT THE FOREGOING CONFIDENTIALITY AGREEMENT

AND I AGREE THAT [WATSON OR JACKSON] AND I SHALL BE BOUND

THEREBY."  Apr. Agr. 3; Sept. Agr. 3.

Thus, the contractual terms of both Confidentiality Agreements explicitly set

forth that Masters and her counsel cannot disclose the Purchase Agreements or the

information therein, and that if they do disclose that information they will cause

Balance Point irreparable harm and that Balance Point would be entitled to an

immediate injunction.  Those distinct, enforceable terms directly apply here.

Regarding success on the merits, this Court should find that Balance Point

satisfies this element because the plain language of the contract requires the

enforcement of its terms.  "Contract law principles require that '[w]here the

contractual language is clear and unambiguous on its face, it is this Court's duty to enforce the contract as drafted and executed by the parties.'" *State v. Shepard*, 2010 MT 20, ¶ 14, 355 Mont. 114, 225 P.3d 1217 (quoting *Felska v. Goulding,* 238 Mont. 224, 230, 776 P.2d 530, 534 (1989)).  In *Felska*, the Montana Supreme Court found the plain, unambiguous language of a property ownership agreement required the enforcement of a sale provision.  *Felska*, 776 P.2d at 533-535.  The same reasoning applies here.

There can be no doubt as to the intent and binding effect of the Confidentiality Agreements, and this Court should enforce those contracts through an injunction.  (Notably, the terms of the Confidentiality Agreements provide for the imposition of an immediate injunction.)  The contracts require Masters and pertinent counsel to safeguard the confidentiality of Balance Point's Purchase Agreements and other confidential information.  There should not be any dispute as to the binding effect of those contracts, which Masters entered under the express advice of legal counsel.

Masters' response to the allegations in Balance Point's Second Amended Complaint confirms she breached the Confidentiality Agreements when she provided the Purchase Agreements to Black Robe.  Indeed, in Masters' answer she has changed her position and now admits providing "a portion of the funding document to Scrantom."  Masters Ans. ¶ 56.  The Black Robe subpoena documents

13

actually show she provided the entire Purchase Agreement (no attachments) to Black Robe.  Given that Masters' pleading acknowledges the allegations at the heart of this injunction, Balance Point fulfills the element of likelihood of success on the merits.  Masters' disclosure of the Purchase Agreement is a blatant breach of the Confidentiality Agreements.

Thus, in all likelihood, Balance Point will prevail on this claim against Masters.  Under the law, that is all that a party seeking an injunction needs to show for the purposes of this element.  Balance Point fulfills this element of the preliminary injunction analysis.

### b.    Irreparable Harm

The disclosure of Balance Point's Purchase Agreements and other confidential information constitutes an irreparable injury.  In fact, the contracts that Masters has already breached, the Confidentiality Agreements, explicitly state that the disclosure of this information constitutes an irreparable harm.  Apr. Agr. 2; Sept. Agr. 2.  Her execution of those contracts serves as agreement to the existence of irreparable harm.

The Court should note that Balance Point carefully—and at great expense— engaged a team of legal and business professionals to construct the model for the Purchase Agreements.  *See* Decl. Napp.  This process took over one year and cost Balance Point in excess of $100,000.  *Id.*, ¶ 14.  Balance Point painstakingly

14

blended the opinions of corporate counsel, ethics counsel, family law counsel, and business professionals to create the Purchase Agreements, which are at the heart of its work and the subject of the Confidentiality Agreements. *Id.*, ¶ 12. The Purchase Agreements reflect Balance Point's business strategy and the precise, but also nuanced, manner that it employs to conduct its business affairs. *Id*, ¶ 4. This material is proprietary in nature and is the reason Balance Point requires its clients to execute confidential agreements.

In this regard, Balance Point has engaged an expert witness, Dr. Jerry Furniss, who is an expert in the field of business entities, business models, and business practices. After executing a non-disclosure agreement with Balance Point, Dr. Furniss examined the Balance Point Purchase Agreements and interviewed Napp concerning Balance Point's business practices and interests. *See* Decl. Dr. Jerry Furniss (Feb. 28, 2013), attached as Ex. F. Dr. Furniss recognizes the significant value of the Purchase Agreements to Balance Point. *Id.* Based upon his experience and his review of the Balance Point Purchase Agreements, he makes the following points: (1) the Purchase Agreements contain material that is typically safeguarded as proprietary material by businesses; (2) they give Balance Point a competitive advantage in its field of business; (3) it would take a business competitor considerable time and expense to attain the same level of business practice that is reflected through Balance Point's Purchase Agreements; (4) the

Purchase Agreements essentially constitute Balance Point's business model, which in a competitive business world is a closely safeguarded asset; (5) the release of these materials to the general public or to a competitor would cause Balance Point great and irreparable harm. *Id.*

Notably, the Montana Supreme Court has explicitly recognized the potential for irreparable harm through the breach of a business contract, and affirmed the use of a preliminary injunction to forestall such harm. *See Four Rivers Seed Co. v. Circle K Farms, Inc.*, 2000 MT 360, 303 Mont. 342, 16 P.3d 342.  In *Four Rivers*, the court affirmed the imposition of a preliminary injunction where a seed potato business owner stood to suffer loss related to his prospective seed potato business because a grower was improperly using the owner's product. *Four Rivers*, ¶¶ 5-9.

Pursuant to the contract, the defendant-grower was limited to earlier generation seed potatoes and specifically forbidden from growing fourth-generation seed potatoes. *Id.*, ¶ 15.  Nonetheless, the grower admittedly did grow fourth-generation seed potatoes. *Id.*  The owner sued for breach of contract and a preliminary injunction, arguing that an injunction was necessary because he stood to lose his business investment in the seed potato he had cultivated. *Id.*, ¶¶ 14-19. The owner was concerned because he was still in the process of cultivating his seed potato product, which meant he was carefully safeguarding the seed potato's reputation. *Id.*  Perhaps more importantly, the owner also stood to lose everything

16

if a grower independently marketed a crop of fourth-generation seed potatoes because the owner would likely lose his ability to exclusively control production and certification.  *Id.*  Thus, the Montana Supreme Court affirmed the district court's decision to grant an injunction because it was necessary to stop the grower's crop to prevent both the possibility of a ruined reputation and to prevent the possible loss of the owner's business product investment.  *Id.*  The court agreed with the owner's argument that the potential loss of reputation and business investment constituted an irreparable injury.  *Id.*

This Court should apply the same reasoning here and find the element of irreparable injury is fulfilled as found in *Four Rivers.*  Just as the court there recognized that the owner stood to lose his entire business investment through the grower's breach of contract, Balance Point faces the possibility of a similar, irreparable loss if Masters is allowed to continue to disseminate the Purchase Agreements.  Napp and Dr. Furniss have addressed the significant financial investment reflected in those agreements and their strategic value to Balance Point. The Court, therefore, should find that the disclosure of the Purchase Agreements and non-compliance with the Confidentiality Agreements will cause Balance Point irreparable harm.

//

//

17

### c.     Balancing of the Equities

Balance Point fulfills this requirement because Masters does not suffer a loss through the imposition of an injunction.  Indeed, the simple fact that Masters is enjoined from distributing Balance Point's confidential information does not prejudice Masters; whereas, as addressed above, it presents substantial prejudice to Balance Point.

### d.     Public Interest

Balance Point also fulfills this element because public policy favors the enforcement of business contracts such as the Confidentiality Agreements that are the subject of this motion.  Montana's business community, as well as its citizens in general, would suffer if it could not rely on contractual principles, the use and reliance upon contracts, and the enforcement of contracts.  Holding contracting parties to their contractual obligations is a bedrock principle of contract law in Montana.  It provides certainty and confidence for everyone who enters a contract. To allow Masters to dodge her contractual obligations is squarely against Montana public policy and undermines the principles and benefits that flow from the policy and legal tenets associated with the enforceability of contracts.  The legal analysis for a preliminary injunction does not include the ultimate decision on the underlying contract, but the Court should consider the importance of contracts in Montana, and the necessity of their reliability.

2. **The Court Should Enjoin Masters Because the Purchase Agreements are Trade Secrets.**

   a. **Success on the Merits**

The Court should find that a preliminary injunction preventing Masters from disclosing Balance Point's Purchase Agreements is warranted because those agreements constitute trade secrets. Balance Point sets forth this claim as Count III of the Second Amended Complaint. Dkt. 92 at 21-23. Balance Point will likely succeed on the merits of its trade secrets claim against Masters, which satisfies this element of the preliminary injunction analysis.

Under the Montana Trade Secrets Act, Montana Code Annotated §§ 30-14-401 et seq., a party can pursue a claim for the improper disclosure of trade secrets. Section 30-14-404 specifically provides that a party may recover damages for the "misappropriation" of a trade secret. Mont. Code Ann. § 30-14-404 (2011). The act provides this definition of 'Misappropriation,' which applies here:

> [The] disclosure or use of a trade secret of another without express or implied consent by a person who at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limits its use.

Mont. Code Ann. § 30-14-402(2)(b)(ii)(B) (2011).

The statute also provides that injunctions are an appropriate means to prevent a party from misappropriating another party's trade secrets: "Actual or

threatened misappropriation may be enjoined."  Mont. Code Ann. § 30-14-403

(2011).

The Trade Secrets Act defines "trade secret":

[I]nformation or computer software, including a formula,
pattern, compilation, program, device, method,
technique, or process, that:

(a) derives independent economic value, actual or
potential, from not being generally known to and not
being readily ascertainable by proper means by other
persons who can obtain economic value from its
disclosure or use; and

(b) is the subject of efforts that are reasonable under the
circumstances to    maintain its secrecy.

Mont. Code Ann. § 30-14-402(4) (2011).

In this case, it is evident that Balance Point has carefully attempted to

maintain the confidentiality of its Purchase Agreements and other materials.  It is

also evident that Masters knew of these efforts; that she and her attorneys agreed to

keep the agreements private; and that Balance Point relied on those representations

as a prerequisite to tender the Purchase Agreements to Masters.  She subsequently

misappropriated these materials when she disclosed them to Black Robe.  Notably,

the Trade Secrets Act does not even require "actual misappropriation" for the

imposition of an injunction, the threat of misappropriation satisfies the

requirements of the statute.  Mont. Code Ann. § 30-14-403.  That threat continues

to exist despite Masters' execution of an agreement not to disclose the Purchase

Agreements.

Regarding the definition of "Trade Secrets," both Napp and Dr. Furniss have addressed the importance of Balance Point's Purchase Agreements and similar materials above.  Dr. Furniss is an expert in the field of business practices and his observations, as set forth in the preceding section, satisfy the definition of a trade secret.

As set forth above in the section discussing the breach of the Confidentiality Agreements, Balance Point has irrefutable evidence that Masters faxed the Purchase Agreements to Black Robe.  Indeed, in her answer to Balance Point's Second Amended Complaint Masters now admits she provided Scrantom and Black Robe the Purchase Agreement despite specifically denying this point under oath.  Given that Balance Point's beliefs were confirmed through the subpoenaed information from Black Robe, Masters has now admitted disseminating Balance Point's confidential materials.  This disclosure is the basis for Balance Point's trade secrets claim.  It gives Balance Point a solid case against Masters.  Given these points, Balance Point will likely succeed on the merits of its trade secret claim against Masters.

b.    **Irreparable Harm**

Balance Point incorporates its argument for this element as set above forth in its analysis of Masters' breach of the Confidentiality Agreements section.  Both

sections concern the prevention of the disclosure of Balance Point's Purchase

Agreements and similar materials.  The merits of the element of irreparable harm

are the same—Balance Point stands to suffer an irreparable injury if Masters is

allowed to continue to disseminate the Purchase Agreements and similar materials.

### c.      Balancing of the Equities

The Court should find that Balance Point satisfies this element.  On one

hand, Balance Point faces a significant loss, an irreparable injury.  Masters, on the

other hand, will not suffer any prejudice through the imposition of an injunction

that prevents her from disclosing Balance Point's materials.

### d.      Public Interest

Balance Point meets this element because an injunction will serve the public

interest through the enforcement of laws that support trade secrets and proprietary

information.  This also supports respect for ownership interests and intellectual

capital, which are of significant importance for a free market capital economy.  It

certainly will not be adverse to the public interest to impose an injunction against

Masters.

//

//

//

//

**C.      Spending:  The Court Should Enjoin Masters from Exceeding the Spending Limit As Set Forth in the Stipulation She Filed with this Court.**

**1.      Success on the Merits**

For the same reasons this Court should find that Balance Point will likely succeed on the merits concerning the enforceability of the Confidentiality Agreements, the Court should find here that the contract Masters drafted and filed as a stipulation in this case, the Spending Agreement, is enforceable.  For the purposes of this analysis, the Court need only find that Balance Point will likely succeed on the merits.  As set forth above, "[c]ontract law principles require that '[w]here the contractual language is clear and unambiguous on its face, it is this Court's duty to enforce the contract as drafted and executed by the parties.'" *Shepard*, ¶ 14 (quoting *Felska*, 238 Mont. at 230, 776 P.2d 534).  The same reasoning applies here.

The language of the Spending Agreement speaks for itself:

> The attorneys came to an agreement that Lila Masters will not to expend [sic], transfer or otherwise dissipate any of her assets that she is in possession of or is to receive under her property settlement agreement in the underlying divorce litigation pending further order of this Court.  Further it was agreed that Ms. Masters would be permitted to expend up to $15,000 per month in living expenses pending further Order from this Court.

Dkt. 21.

It is undisputed that Masters filed this agreement.  She admits she has not complied with the terms of her stipulation.  Notably, Balance Point was in the process of filing a motion for a preliminary injunction early in the case when Masters agreed to file the stipulation with the Court limiting her spending. Balance Point withheld from filing the motion for an injunction based upon the written stipulation Masters filed with this Court.

Masters has flouted the Court's authority by ignoring the requirements of her stipulation.  Masters' own accounting of her financial records makes this point clear.  She has breached the stipulated spending limit of $15,000 per month. Masters does not dispute this point.  Instead, after the fact, she has sought permission to escape the binding effects of this stipulation.  Dkt. 57.   Despite this effort for relief, it is undisputed that Masters has already disregarded the requirement that she first get permission from this Court before exceeding the limits of the Spending Agreement.

Thus, this Court should find that Balance Point meets the requirements for this element.  Balance Point will likely succeed on the merits here because Masters has not complied with the Spending Agreement she filed with this Court.

### 2.      Irreparable Harm

The Montana Supreme Court has consistently confirmed that a preliminary injunction is warranted where a party faces the loss of its ability to recover a

monetary judgment.  In recent years the Montana Supreme Court has explicitly stated that an inability to recover monetary damages due to the dissipation of assets constitutes an irreparable harm.  *Shammel*, ¶¶ 21-22, 27; *Van Loan*, 271 Mont. at 184-185, 895 P.2d at 618-619.

The court's lengthy analysis in *Van Loan* is particularly compelling, when it carefully analyzed this issue as a case of first impression for Montana.  *Van Loan*, 271 Mont. at 178, 895 P.2d at 615.  In the course of its approval of an injunction in the face of dissipating financial assets, the court scrutinized numerous federal court decisions that employed a similar injunction analysis:  "The Ninth Circuit, in *Estate of Marcos*, noted that most of the Circuit Courts of Appeal have held that preliminary injunctions are available when a money judgment was in danger of being made worthless by the dissipation of assets."  *Van Loan,* 271 Mont. at 179-180, 895 P.2d at 616-617 (citation omitted).  The court further analyzed earlier Montana preliminary injunction cases where it had not found an irreparable injury concerning money.  The court concluded that if those cases had involved a threat "to secret or dissipate their assets," then the requirement for irreparable harm would have been fulfilled.  *Id.*, 271 Mont. at 183-184, 895 P.2d at 618-619 (analyzing *Dicken v. Shaw*, 255 Mont. 231, 841 P.2d 1126 (1992) and others).

As a result of the foregoing analysis, the *Van Loan* Court concluded that the prospect of the dissipation of $1.5 million dollars in financial assets was an

irreparable harm for the purposes of a preliminary injunction analysis.  *Id.*, 271

Mont. at 178, 184, 895 P.2d at 615, 619.  The court unequivocally endorsed the

application of a preliminary injunction in cases concerning the prospect of the

dissipation of assets:  this holding "appl[ies] only in cases where a party seeking

money damages <u>alleges</u> that the defendant is hiding or dissipating his/her assets in

such a manner that a money judgment will be ineffectual and/or the plaintiff will

be irreparably injured."  *Id.*, 271 Mont. at 184-185, 895 P.2d at 619 (emphasis

added).

The Court should note that Masters has confirmed she exceeded the $15,000

monthly budget she previously pledged to follow through the agreement filed with

this Court.  Dkt. 21.  Depo. Masters Vol. II, 100:6-17.  She has ignored this

requirement, which the parties agreed to in an effort to preclude the need for a

preliminary injunction.  Instead, she now seeks to formally avoid those

requirements through her pending motion with this Court, which Balance Point

opposes as set forth in this brief and through its request for an injunction.

Masters' demonstrated failure to comply with the stipulated budget shows

there is no question that Balance Point faces a situation where it stands to lose any

recovery of the assets due upon judgment.  This point is further underscored by the

facts that Balance Point would lose in excess of $1 million due under the contract.

It is noteworthy that, as set forth above, the court in *Van Loan* did not require the

moving party to prove that the other party was hiding or dissipating assets, although at her breakneck pace, Masters' spending certainly qualifies.  Balance Point has made a compelling allegation that is supported by substantial proof, including Masters' own acknowledgment that she failed to abide by her prior stipulation filed with this Court.  Accordingly, this is precisely the situation contemplated as an irreparable injury due to the dissipation of assets that merits the imposition of a preliminary injunction.

**3.    Balancing of the Equities**

The injunction Balance Point seeks is a reasonable imposition on Masters' finances pending the resolution of this legal action.  Masters unconvincingly argues that $15,000 per month is not enough to account for her living expenses as well as the litigation expenses related to this case.  Dkt. 57.  She contends that her legal expenses will exceed $5,000 per month.  However she has not explained how the tax free $15,000 budget will not amply cover her living expenses.  She has testified that her home is paid for and she has no financial responsibility for her adult children.  Depo. Masters Vol. I, 14:10-13.  Masters does not explain why $15,000 per month will not cover her legal expenses as well as her minimal living expenses.

The party that faces the prospect of suffering a greater loss is Balance Point.  Without the preliminary injunction, Balance Point stands to lose all of the proceeds

from its contract and the chance to recoup the legal fees it has been forced to incur to compel Master to abide by her contractual obligations.  Masters already has a demonstrated track record of flouting adherence to a stipulated budget.  The only way to ensure that Balance Point has the ability to realize a return on judgment is to impose this injunction.  This restriction is not permanent and it is reasonably tailored to the circumstances.  The prejudice, if any, associated with any potential imposition incurred by Masters is minimal compared to the prejudice related to the loss of the value of a judgment worth in excess of $1 million.  As the court observed in *Shammel*, when one party stands to incur a much greater loss than the other, the requirements for this element are met.  *Shammel*, ¶¶ 23-24.

### 4.    Public Interest

The public interest is met through the enforcement of contractual rights in Montana and enforcement of legal judgments.  As a matter of public policy, parties to a contract should not be able to escape their contractual obligations.  That is the very foundation of contract law and that is exactly what Masters seeks to escape here.

In fact, Master's case represents a broad renunciation of the tenets of contract law.  Masters intends to take the benefit of Balance Point's $310,435, which she used to leverage a $4.3 million settlement, and effectively have it treated as a gift to her.  In the interim, Masters seeks to avoid the contractual terms of any

contract, agreement, and stipulation she entered, despite the fact that in every instance Master had legal counsel advising and representing her.  In summary, Masters seeks to avoid every consequence of every agreement she ever executed with Balance Point.

The public interest is served through the enforcement of a party's contractual rights and, ultimately, enforcement of a legal judgment.  Masters has not presented a compelling argument why this Court should suspend the legal and traditional contractual rights of a party after she repeatedly ratifies the agreement and receives the benefit of the bargain and Balance Point has not received its consideration.

## IV.  Conclusion

Accordingly, the Court should issue a preliminary injunction as follows:

- Enjoining Masters from any further disclosure of Balance Point confidential documents specifically including the Purchase Agreements;

- Enjoining Masters from spending more than $15,000 per month without further order of the Court, such spending to include living expenses and any attorneys' or professional fees and costs that she may incur;

- Require that Masters provide to Balance Point on a monthly basis her bank account statements so that her compliance with the injunction can be monitored;

- Enjoining Masters from encumbering any of her significant assets; and

- Requiring that Masters deposit any other property that she receives in the Divorce (i.e. shares of Juridica, further payments from Scrantom) with the Court for safekeeping.

DATED this 4th day of March, 2013.


/s/  Jeffrey M. Roth
Attorneys for Plaintiff Balance Point
Divorce Funding, LLC

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(d)(2)(E), I certify that this PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION is printed with proportionately spaced Times New Roman text typeface of 14 points; is double-spaced; and the word count, calculated by Microsoft Office Word 2010, is 6,338 words long, excluding Caption, Certificate of Service and Certificate of Compliance.

/s/  Jeffrey M. Roth
Attorneys for Plaintiff Balance Point
Divorce Funding, LLC

31