Todd Shea
Shea Law Firm, PLLC
225 East Mendenhall
Bozeman, MT 59715
Telephone: (406) 587.3950
Facsimile: (406) 587-9752
Email: toddshea@shealawoffice.net

*Attorney for Lila Masters*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| BALANCE POINT DIVORCE FUNDING, LLC, a Nevada Limited Liability Company, on Behalf of itself and as the Managing member of BALANCE POINT FUNDING NUMBER I, LLC, | ) CAUSE NO. CV-12-40-BU-SEH<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) BRIEF IN SUPPORT OF |
| | ) MOTION FOR SUMMARY |
| v. | ) JUDGMENT TO DECLARE |
| | ) CONTRACT VOID |
| LILA MASTERS, Counterclaimant, Third-Party Plaintiff and Defendant, | )<br>)<br>) |
| v. | )<br>) |
| JOHN DOES 1-5, and JANE DOES, 1-5, Defendants, | )<br>)<br>) |
| v. | )<br>) |
| STACEY NAPP, Third-Party Defendant, and John Does 1-5. | )<br>) |

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 1 of 33

COMES NOW Lila Masters and moves this Court for Summary Judgment to declare Balance Point's Funding Documents void as a matter of law.

## INTRODUCTION

In return for funding, "consulting" and "ancillary services" to Ms. Masters in her divorce proceeding, Balance Point "purchased" a 25% (and in some cases 37%) interest in Ms. Masters' marital asset claims depending on the "success" of the divorce proceeding. Balance Point's funding documents are void as a matter of law as they violate clear Montana public policy concerning the institution of marriage, encouraging reconciliation, and allowing for the amicable settlement of marital disputes. Further, the funding documents are contingency fee agreements which are not permitted in divorce proceedings. Also, Balance Point's pervasive involvement in the divorce proceedings pursuant to its funding documents amounted to the unauthorized practice of law and violates Montana law concerning a third party's unwarranted intrusion and interference with the client-lawyer relationship.

Balance Point has plead that it had a "privilege to be involved in the [divorce proceeding] to protect its own interests" and that it "was

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 2 of 33

justified in being substantively involved in the divorce strategy." Indeed, Balance Point has asserted a breach of contract claim against Ms. Masters alleging that she "repeatedly refused to cooperate with [Balance Point] in the prosecution of her marital asset claims…"

Balance Point's position, coupled with the terms of the funding documents and the undisputed facts, render it appropriate for this Court to declare the funding documents void and dismiss all claims in this matter.

## BACKGROUND

I.   Underlying Divorce Proceeding, Initial Communications Between Balance Point and Ms. Masters, and Balance Point's Services.

Beginning in 2009, Ms. Masters was involved in a divorce proceeding in the Gallatin County, Montana District Court with her now former spouse Timothy Scrantom.  Mr. Scrantom was a co-founder of Juridica Capital Management, Ltd. (hereinafter, "Juridica") which provides third-party funding in commercial litigation.   (SUF, ¶ 1.) (Ms. Masters' settlement from her divorce proceeding entails

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 3 of 33

shares of stock Ms. Masters owns in Juridica and this is discussed below.) (SUF, ¶ 2.)

Stacey Napp is the founder and Chief Executive of Balance Point Divorce Funding, LLC, which operates out of Beverly Hills, California and provides third party funding in divorce litigations. (SUF, ¶ 3.) Ms. Napp graduated from law school and her Arizona license to practice law lapsed in 2003 after she did not maintain her Continuing Legal Education credits.  (SUF ¶ 4.)

In December of 2010 Ms. Masters and Ms. Napp began communicating after Ms. Masters learned that Balance Point was a third-party funder in divorce proceedings.  (SUF ¶ 5.)

As part of Balance Point's advertising on its website[1], it represents, among other things, the following:

- "Comprehensive Resources, Equitable Outcomes."
- "**We become a trusted resource you can count on from litigation through collection."** (Emphasis in original.)
- "We are experts in asset investigation and collection litigation."
- "We become invested in your divorce claims and resolution.   In this way, our interests are precisely aligned with yours."
- **"We become business partners."** (Emphasis in original.)
- "We assign each Balance Point contract a case manager to support you and your divorce professionals."

(SUF ¶ 7.)

---

[1] Balance Point's current website is "the same as it was during 2011, with the exception of correction of a few non-hyphen typographical errors." (SUF ¶ 6.)

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 4 of 33

Also, Balance Point's website notes that prior to funding it requires "an in-person meeting." (SUF ¶8.)

After Balance Point decides to fund a case, it claims to help the divorcing spouse put together a professional team. (SUF ¶ 9.)

Balance Point claims that Ms. Napp "works closely with the retained professionals" (SUF ¶ 10.)

II.   <u>Initial Funding Document Between Balance Point and Ms. Masters.</u>

Ms. Masters and Balance Point entered into a funding document on or about May 24, 2011 whereby Balance Point agreed to fund a deposition (of Mr. Scrantom's business partner in Juridica) in the amount of $7,500.00 in the divorce proceeding in return for 5% of Ms. Masters' marital asset claims. (SUF ¶ 11)

On June 21, 2011, Ms. Napp flew to Montana and met with Ms. Masters and her Montana divorce attorney, Ron Waterman, to discuss the status of the divorce case, potential further funding, and "what Balance Point could bring to the table relative to money and expertise."    Ms. Napp advised Mr. Waterman that she felt "that bringing some pressure against Juridica might cause Juridica to pay a portion of [Mr. Scantom's interests] in Juridica."   (SUF ¶ 12.)

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 5 of 33

On July 18, 2011 Ms. Napp sent a detailed memo (which is discussed in further detail below) to Mr. Waterman and other attorneys on behalf of Ms. Masters containing her instructions and comments on strategy for discovery and a then upcoming Court hearing.  (SUF ¶ 13.)

In the summer of 2011, Ms. Napp introduced Ms. Masters to David Parker, an attorney from Los Angeles, California.  Mr. Parker and his law firm then began representing Ms. Masters and Balance Point in the divorce proceeding.  According to a September 6, 2011 email from Ms. Masters to her attorneys which was drafted by Ms. Napp, Balance Point and Ms. Masters designated Mr. Parker as the "point person" or "general contractor" of Ms. Masters' litigation team. (SUF ¶ 14.)

III.  <u>Balance Point's Second Funding Document.</u>

On September 29, 2011 Ms. Masters entered into an amended funding document with Balance Point.   According to Balance Point, aside from the increased funding amounts and Balance Point's increased percentages of the purchased claims, the terms of both funding documents are "substantially identical." (SUF ¶ 15.) Given this, and because the September 29, 2011 funding document is the

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 6 of 33

last governing document between the parties, all further references to the Funding Document refer to the second funding document.

a.   Terms of Funding Document.

In return for funding in the amount of $310,435, and providing "consultation" and "ancillary services" to Ms. Masters in the divorce proceeding, Balance Point purchased a 25% interest in Ms. Masters' marital asset claims,[2] inclusive of any marital support payments, legal fees, and payments made by Mr. Scrantom.[3] (SUF ¶ 17.)   Balance Point has described its anticipated fee from the divorce proceeding as follows:

- "[t]he value of [its] interest, and thus the return on its investment is determined by the success of the claim."
- Balance Point's payment "would be determined by the relative success or failure of prosecuting Masters' marital asset claims.";
- Balance Point has contended that Ms. Masters has "admit[ted]" that Balance Point's "25% interest is contingent on the outcome of the divorce."   Further, Balance Point explained that "the greater the recovery by Masters, the higher the value of BP's 25 % interest."

(SUF ¶ 18.)

The funding document provides that it "shall be construed" under Montana law. (SUF ¶ 20.)   Further, it states that if Ms. Masters

---

[2] The term Marital Asset Claim was "intended to have the broadest possible meaning permitted in law and in equity."  (SUF ¶ 16.)
[3] Balance Point's percentages were "in gross", meaning without deduction for any fees, charges, costs or taxes incurred. (SUF ¶ 19)

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 7 of 33

ever challenged whether the Funding Document violated Montana law or was otherwise unenforceable, Ms. Masters was required to indemnify Balance Point. (SUF ¶ 21.)

A litigation budget was attached and "made a part" of the funding document and provided for $310,435 in funding.  (SUF ¶ 22.) The litigation budget included attorneys' fees and costs in the amount of $25,000 anticipated by Balance Point to protect its "investment", a $5,000 "due diligence" reimbursement fee to Balance Point, and also allowed Balance Point to charge $100 per hour for what it described as "administrative services." Ms. Masters had no right to approve or question Balance Point's payment from Ms. Masters' litigation budget for any fees and costs incurred by Balance Point in protecting its investment. (SUF ¶ 23.)

The funding document provides that "Balance Point shall have sole and exclusive control" of Ms. Masters' litigation budget.  (SUF ¶ 24.)  Additionally, it states that Balance Point "shall be solely and exclusively responsible for" paying Ms. Masters' attorneys after they submit "monthly statements setting forth the specific services rendered and costs incurred."  (SUF ¶ 25.)

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 8 of 33

Mr. Parker's firm prepared detailed monthly invoices and submitted them directly to Ms. Napp at Balance Point, and received payment from Balance Point.  Mr. Waterman's firm also submitted bills to Balance Point for his services rendered in the divorce proceedings after Balance Point entered into the Funding Document with Ms. Masters, and he was paid for some of his services by Balance Point.  (SUF ¶ 26.)

Balance Point's interest in Ms. Masters' marital asset claims vested upon the signing of the funding document "even if" it did not disburse any of the funds. (SUF ¶ 27.)

b.      Deterrents to Reconciliation.

If there was a "reconciliation of the spouses" at any time, Ms. Masters would be obligated to pay Balance Point the full amount of its claim.  (SUF ¶ 28.)

Also, the funding document states that "any discontinuation, abatement, or suspension of the divorce proceedings" or Ms. Masters' "failure to prosecute the divorce proceedings in a reasonable manner and in good faith" would cause Ms. Masters to be in material breach of the funding document.  (SUF ¶ 29)

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 9 of 33

Further, "any failure [by Ms. Masters] to cooperate with Balance Point to effectuate the purposes of this agreement" would result in Ms. Masters' materially breaching the agreement. (SUF ¶ 30.) Balance Point determined in its "sole and absolute" discretion whether Ms. Masters' material breaches remained "uncured" and it availed itself of multiple options in the event Ms. Masters did not cure the material breaches. (SUF ¶ 31.)

If Ms. Masters were to accept anything less than 37.5% of the gross marital estate through settlement "without the consent of Balance Point", Balance Point would be entitled to recover from Ms. Masters an amount equal to ½ of 75 % (i.e., 37.5%) of the gross marital claims. (SUF ¶ 32.) Similarly, if Ms. Masters accepted a claim "in the nature of support" payments "without the consent of Balance Point", Balance Point's interest in said support payments increased, i.e., "it shall be 25% of 75% of the highest amount of support" which a court "would have been permitted to award" Ms. Masters under Montana law.  (SUF ¶ 33.)

IV.   <u>Involvement of Balance Point In the Divorce Proceeding Based Upon The Funding Document.</u>

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 10 of 33

Balance Point attached and incorporated a "Joint Interest/Joint Defense/Joint Prosecution" agreement between it and Ms. Masters to the Funding Document. It provided for the "joint prosecution" and "sharing of thoughts, analysis, and impressions of the parties and their counsel and coordination of law and motion efforts [ ] " between Ms. Masters and Balance Point. (SUF ¶ 34.)

Also, Ms. Napp and Balance Point are hired as "consultants" in all divorce litigations that they decide to fund, and use a standard consulting agreement with the involved attorneys. (SUF ¶ 35.) Consistent with this policy, virtually identical documents entitled "**Marriage of Masters Consulting Agreement[s]"** (emphasis in original) were entered into between Mr. Parker's law firm and Mr. Waterman's law firm and Ms. Napp wherein Ms. Napp was "retained as a consulting expert" by  the respective law firms.  (SUF ¶ 36.) The Consulting Agreements provided that Ms. Napp "will render advice, assistance, consultation and expert opinion" to both law firms "in connection" with the "representation of" Ms. Masters in her divorce proceeding.  (SUF ¶37.)  The Consulting Agreements, however, provide that "**the mere fact of [Ms. Napp's] engagement is likewise privileged, and should be held in confidence and not**

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 11 of 33

**disclosed to any person or entity."** (Emphasis in original.)   (SUF ¶ 38.)

Consistent with the Funding Document and its attachments emails produced in discovery reveal that Ms. Napp had a substantial amount of contact and involvement with Ms. Masters' divorce attorneys.   Ms. Napp sent at least 200 emails to the attorneys between May 2011 and June 2012. (SUF ¶ 39.)   Below is only a sampling of the email correspondence between Ms. Napp and Ms. Masters' divorce attorneys.

- 7/18/11 - Ms. Napp sent an email to Mr. Waterman and attached a detailed 4 page memo entitled "Hearing Tomorrow" which concludes with: "[t]he above are the high points. There are more of course. The point of the above is to impress upon Judge Bowen the following: 1) Lila needs additional discovery; … 3) The areas that Lila seeks discovery from are both critical to ascribing a value to the marital estate but also calculated to lead to relevant and admissible evidence at trial; …6) Lila is well represented by two well respected members of the Montana Bar. Good luck and should you have any questions about the contents of this memo, I am available should you wish to discuss with me or obtain any necessary information." (Emphasis added.)
- 10/5/11 – Ms. Napp to Mr. Brocchini (New York Counsel) proposing some 7 additional categories of documents to be added to a subpoena prepared by Mr. Brocchini.
- 10/5/11 – Ms.Napp to Mr. Brocchini listing some 32 detailed questions for the then upcoming deposition of Mr. Scrantom's former business partner.
- 11/1/2011- Ms. Napp to Mr. Parker and Mr. Waterman: "Dave: I absolutely agree with you. I think we have to hit [Scrantom] as hard as possible on as many fronts as possible, otherwise who knows what he will concoct against Lila if he has the opportunity."

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 12 of 33

- 11/4/11 – Ms. Napp to Mr. Parker – "Please see my redlined comments to the [motion for theft]… Ron I am working on the other motions now."
- 11/4/11 - Ms. Napp to Mr. Waterman: "Just said he sent you the sheriff's report. Please include with your filing as an attachment."
- 11/9/11 – Ms. Napp to Mr. Waterman: "For trial preparation purposes and in anticipation of a line of attack that Dave believes Tim will take, please forward ALL COURT ORDERS in this case asap." (Emphasis in original.)
- 11/16/11 –  Ms. Napp to Mr. Waterman re. Ms. Masters' draft Affidavit: "I am going to have a significant amount of comments. Please do not send out until you read my comments. I should have to you all within the ½ hour."
- 11/16/11– Ms. Napp to Mr. Waterman and Mr. Parker: "I understand on both counts. My sense would be to file the motion to disqualify[4] regardless of what they do or promise to do."
- 11/21/11 - Ms. Napp to Mr. Waterman: "I believe we have a real problem now. They have preempted us and the colloquy between Dave and Gillette is being played for maximum prejudicial effect. We need to get our motion filed asap among other things." (Emphasis added.)
- 11/25/11- Ms. Napp to Mr. Parker and Mr. Waterman: "Let's just stop and regroup. I suggest no more discussions with Chris Gillette until we get on the same page in [sic] our side. This case is a mess and I am. [sic] Re [sic] serious concerns about the path we are taking and Lila receiving an equitable outcome before the current judges."
- 11/28/11- Ms. Napp to Mr. Parker: "Here are all my comments to your most recent draft [of the motion to disqualify]. Please confirm receipt with reply email."
- 11/28/11- Ms. Napp to Mr. Waterman re. latest motion: "I will have my comments to you on your latest motion in the next ½ hour. made quite a few suggested changes. Please review."
- 11/28/11 Ms. Napp to Waterman, Parker, and Masters re. "My thoughts for your consideration."  A detailed memo was attached to the email. The memo was addressed to a Lou Piccolo, and it is understood that Mr. Piccolo was the "investor" in Ms. Masters'

---

[4] This was in reference to a motion to disqualify opposing counsel in the divorce proceeding, which was unsuccessful.

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 13 of 33

case. The memo states, among other things, as follows: "Consequently, I believe it is in Lila's best interests to do whatever is necessary, including filing appeals to get the trial postponed. I can turn back to media exposure (which I had reservations about backfiring once the Montana judges were aware of the coverage), and if there is any colorable basis to have the basis for an appeal on federal questions and get out of the Montana courts at least on one issue, that we should do so." Ms. Napp finishes by stating, "In sum, I do not think that Lila will get a fair shake unless one of two things happen [sic] here: the Montana courts are concerned about exposure outside their own backyard and some oversight body making contradictory rulings (Federal court or other state Bar associations).  (Emphasis added.)

- 12/15/11 – Ms. Napp to Mr. Waterman: "At what point do we file a request for supervisory writ up to the Montana Supreme Court?"
- 1/4/12 – Ms. Napp to Mr. Parker and Mr. Waterman re. a Reply Brief: "Also, in the footnote and elsewhere, I think we need to identify that Izzy is the parties daughter."
- 3/6/12 – Ms. Napp to Mr. Waterman and Parker: "Please see my redlined comments to your draft motion. I think it would be helpful, if we could drop in some language from a previous ruling by the Montana Supreme Court where a matter was taken away from a Standing Special Master or even a judge for neglect."

(SUF ¶40.)

Also, the Parker Firm's invoices submitted to Balance Point reveal that the firm performed legal services on Ms. Masters' case pursuant to Ms. Napp's directive.  (SUF ¶ 41.)

Also, Mr. Waterman testified that "Ms. Napp had been involved in much of the work as we were going on. She reviewed briefs, things along those lines….."  (SUF ¶ 42.)   Also, Mr. Waterman testified that Ms. Napp was "aggressive with respect to the litigation", and Mr. Waterman at times had to advise Ms. Napp "not to engage in a war

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 14 of 33

with Mr. Scrantom [ ]", (SUF ¶ 43.)   Further, Mr. Waterman testified that Ms. Napp's approach to the litigation was a little more aggressive than his approach, and the "<u>approach [Ms. Napp] wanted us to take was different than the approach that I thought was beneficial to my client [ Ms. Masters]</u>." (SUF ¶ 44)

In addition, when Ms. Napp called or emailed the involved attorneys, the attorneys would in turn bill their time and this would be taken out of Balance Point's litigation budget for Ms. Masters. (SUF ¶ 45.)

V. <u>Additional Legal Services Performed by Stacey Napp.</u>

In line with the above and consistent with its Funding Document, Balance Point billed Ms. Masters $100 per hour for certain of Ms. Napp's services relating to the divorce matter. These services included Ms. Napp's reviewing and analyzing documents produced in the divorce case by Mr. Scrantom.  Ms. Napp's Declaration submitted in this case explains that the "alternative, was to have the work done by either Waterman (he did not have a paralegal or Parker's paralegal at a rate of $250 per hour.")   (SUF ¶ 46.)

VI.   <u>Balance Point Has Contended In Pleadings That It  Had a "Privilege" and "Contractual Right" To Be "Substantively" Involved in</u>

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 15 of 33

The Divorce Proceedings and "Strategy", and has Asserted a Breach of Contract Claim Against Ms. Masters for "Not Cooperating" in Her Divorce Proceeding..

In pleadings to this Court Balance Point has asserted the following:

- "BP owned a 25% interest in the marital asset claims asserted in the Divorce by investing $310,435 which provides BP a privilege to be involved in that proceeding to protect its investment."
- Balance Point "was justified in being substantively involved in the divorce strategy."
- Balance Point "had a contractual right to actively participate in the divorce strategy."

(SUF ¶ 47.)

Indeed, Balance Point has asserted a breach of contract claim against Ms. Masters alleging that she "repeatedly refused to cooperate with BP [Balance Point] in the prosecution of her marital asset claims...."  (SUF ¶ 48.)

VII.    Balance Point's Litigation Budget is Exhausted in January 2012.

Balance Point's $310,435 litigation budget was expended between October 2011 and January 2012.  (SUF ¶ 49.)  On February 1, 2012 Ms. Napp explained to Ms. Masters in an email that Mr.

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 16 of 33

Scrantom's "threats of litigation" against Balance Point "spooked the Balance Point investor on this case." (On December 2, 2011, Mr. Scrantom sent an email to Balance Point asking if they would accept service of process after he suspected Balance Point's involvement in November 2011.)   Due to this and what Ms. Napp described as Mr. "Parker's inability to get all the 'homework' assignments from" Ms. Masters, it "would make [Balance Point's] task [of getting additional funds for the litigation] challenging to say the least." (SUF ¶50.)  At that point, Balance Point made a "business decision" to not invest any further funds into the divorce proceeding. (SUF ¶ 51.)   However, Balance Point continued to protect its interests arising out of the Funding Document and remained in consistent contact with Ms. Masters' divorce attorneys. Also, on April 13, 2012 Balance Point sent a letter through its attorney to Juridica advising, among other things, that Balance Point was "assessing its legal rights and remedies… for intentional and negligent interference with [the funding document] contract" against Mr. Scrantom and Juridica.     (SUF ¶ 52.)

VIII. <u>Underlying Divorce Case is Settled and Suit is Filed by Balance Point.</u>

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 17 of 33

On April 18, 2012 Ms. Masters entered into a settlement with Mr. Scrantom.   Ms. Masters received her first payment from Mr. Scrantom in early June, 2012 but she did not provide a share of the payment to Balance Point and Balance Point then filed suit against Ms. Masters.   In addition, on June 22, 2012 Balance Point filed a "Notice of Interest" with the Gallatin County Court claiming an interest in the settlement proceeds.   (SUF ¶ 53.)   This was the first time Balance Point filed an appearance in the divorce proceeding.   Also, on June 22, 2012, Balance Point's new Montana counsel sent a letter to Juridica "demanding that any transfers of any interest in Juridica…be made to the order of Balance Point Divorce Funding, LLC and that its name be placed on any issued shares or interest, or proceeds, jointly with Ms. Masters." (SUF ¶ 54.) Also, on August 30, 2012 additional Montana counsel on behalf of Balance Point sent an email to Mr. Scrantom's attorney attaching the above June 22, 2012 letter to Juridica and further demanding that any stock proceeds not be paid to Ms. Masters given Balance Point's interest. (SUF ¶ 55.) To date, Ms. Masters has not received payment on her shares of stock from Juridica which was part of the April 2012 settlement agreement in the divorce proceeding. (SUF ¶56.)

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 18 of 33

IX.  Additional Lawsuits Following Balance Point's Involvement In the

Divorce Proceeding.

On February 14, 2013 Balance Point filed suit in Federal Court

in New York against Mr. Scrantom and Juridica, et al., claiming,

among other things, that Mr. Scrantom interfered with Balance Point's

Funding Documents with Ms. Masters and colluded with Ms. Masters

to avoid paying Balance Point its share of the marital asset claims.

(SUF ¶ 57.)  On March 27, 2013, Mr. Scrantom filed a Rule 11

sanctions motion in Gallatin County given, among other things,

Balance Point's alleged unauthorized and undisclosed involvement in

the divorce proceeding. On May 22, 2013, Mr. Scrantom filed a

separate lawsuit in Gallatin County Court asserting claims for abuse

of process and fraud.   (SUF ¶ 58.)   The second suit names as

defendants, among others, Ms. Napp, Balance Point, Mr. Parker and

his law firm, and Mr. Waterman and his law firm.    (SUF ¶ 59.)

## LEGAL ARGUMENT

I. Montana's Public Policy Must Be Considered in Evaluating the

Balance Point Funding Document.

When a contract has a single object and such object is

unlawful, whether in whole or in part, the "entire contract is void."

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 19 of 33

§28-2-603, M.C.A. The purpose of the Funding Document was to provide "consulting" and "ancillary" services to Ms. Masters for her divorce proceeding and "advance funds on Ms. Masters' behalf in exchange for conveyance of 25% of her marital asset claims." (SUF ¶ 60.)

A contract is unlawful if it is: (1) contrary to an express provision of law, (2) contrary to the policy of express law, though not expressly prohibited; or (3) otherwise contrary to good morals. § 28-2-70, M.C.A.  Although the statute uses the word "or", all 3 of these prongs are met, making the Funding Document unlawful on several levels.

"Public policy can be enunciated by the Constitution, the legislature or the courts at any time, and, whether there is a prior expression or not, courts can refuse to enforce any contract which they deem to be contrary to the best interest of citizens as a matter of public policy." *Anaconda Fed. Credit Union, No. 4401 v. West*, 1971, 157 Mont. 175, 178 483 P.2d 909, 911.

Montana's Supreme Court has announced that "a divorce action is something more than a private controversy and public policy must always be taken into account." *Crenshaw v. Crenshaw*, 1947, 120 Mont. 190, 214, 182 P.2d 477, 490.

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 20 of 33

II.      Montana's Public Policy Favoring Marriage and Encouraging
Reconciliation.

Montana's public policy favoring marriage and encouraging
reconciliation is clearly set forth in statutes and longstanding case law
from the Montana Supreme Court.    Montana's governing statute
relating to marriages and family law states as follows:

MCA §40-4-101. Purposes.

> This chapter shall be liberally construed and applied to promote
> its underlying purposes, which are to:
> (1) strengthen and preserve the integrity of marriage and
> safeguard family relationships;
> (2) promote the amicable settlement of disputes that have
> arisen between parties to a marriage;
> (3) mitigate the potential harm to the spouses and their children
> caused by the process of legal dissolution of marriage;
> (4) make reasonable provision for spouse and minor children
> during and after litigation [ ]. (Emphasis added).

In *Crenshaw,* the Court addressed an attorney's efforts to
reconcile a marriage and noted as follows:

> But public policy has another function here. It favors the
> marriage relation and encourages reconciliation between
> the spouses. .... that the state is specially interested in
> preserving the marriage relation unbroken; for upon its
> permanence depends the family, the foundation of the
> home, "upon the preservation of which, in turn, depends
> good citizenship and the permanency of a republican form
> of government." *Franklin v. Franklin*, 40 Mont. 349, 106 P.
> 353, 354, 26 L. R. A. (N. S.) 490, 20 Ann. Cas. 339;
> *Gates v. Powell*, 77 Mont. 554, 252 P. 377

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 21 of 33

See also, *Walker v. Hill*, 90 Mont. 111, 300 P. 260, 264 (1931), pronouncing that "the reconciliation of all estranged persons is very much to be desired[]" (citations omitted), and *Western Life Ins. Co. v. Bower,* 153 F. Supp. 25 (1957), affirmed 255 F.2d 618.

In addition, the Montana Supreme Court has clearly pronounced that the only "proper parties" to a divorce are the spouses seeking to be divorced. <u>See</u> *In Re Marriage of Heidema,* 335 Mont. 362, 152 P.3d 112, and (2007; 24 AM. JUR. 2d Divorce and Separation Section 205 (2010) (Generally, husband and wife are the only proper parties to a divorce action, especially in light of the private nature of divorce.)

Balance Point's funding document violated a host of clear Montana public policies, including, but not limited to, the following:

1. It involved other parties to the divorce, i.e., Balance Point, and Ms. Napp, and Balance Point's "investor."
2. It did not favor the marriage.
3. It penalized and discouraged efforts to reconcile or settle.
4. It gave rise to four subsequent law suits which remain ongoing.

III.  <u>Other Montana statutes</u>.

Also, MCA §28-2-706 provides, "[ e]very contract in restraint of the marriage of any person other than a minor is void." (Emphasis added.) See *Security State Bank Havre v. McIntyre,* 71 Mont.

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 22 of 33

186,228 (1924) P. 618 *See also* Restatement Second, Contracts §332(3) (1977) (any promise that *tends to* encourage divorce or separation is unenforceable on grounds of public policy); and Am. Jur. 2d, Divorce and Separation §11,13.

IV. <u>Balance Point's Funding Document is a Contingency Agreement and Therefore Void as a Matter of Law.</u>

Montana, like virtually every other state[5], prohibits attorneys from entering in to contingency contracts in divorce proceedings. The reasoning for this is straightforward.  According to *Keller* v. *Turner,* 153 Mont. 59, 153 Mont. 59, 453 P2d 781 (1969) at 61:

> "A contract between an attorney and client, providing for the payment of a fee to the attorney contingent upon the procurement of a divorce for the client, is against public policy and illegal and void. Such a situation involves the personal interest of the attorney in preventing a reconciliation between the parties, a thing which the law favors and public policy encourages.... we think the rule laid down here is applicable regardless of whether the contingent fee agreement is entered into before or after an action for divorce is commenced." (Citing cases)(emphasis supplied) Id. at 61

> See also, in *Coleman v. Sisson,* 71 Mont. 435, 444, 230 P. 582 (1924).

---

[5] See *In Re Smith,* 42 Wash 2d 188, 254 P2d 464 (1953).

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 23 of 33

Balance Point's Funding Document -- which was dependent on the "success" of the divorce proceeding -- was contrary to "the policy of express law, though not expressly prohibited[]" and therefore, the funding document is unlawful pursuant to M.C.A. §28-2-70.

Moreover, Rule 1.5 of the Montana Rules of Professional Conduct provides that "[a] lawyer shall not enter into an arrangement for, charge or collect any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or upon the amount of maintenance or support or property settlement in lieu thereof."  (Emphasis added.)    By its terms, this applies to Ms. Napp as she is a "lawyer", albeit not licensed in Montana, and "enter[ed] into an arrangement for" a fee dependent upon the "success" of the divorce.

Even if Rule 1.5 does not literally apply to Ms. Napp or Balance Point, M.C.A. §1-3-202 provides that "where the reason is the same, the rules should be the same." Here, the policy reasons to prohibit contingent fees in divorce actions are the same with respect to the prohibition against non-lawyers (such as Balance Point) acquiring a contingent fee interest in a divorce action. Indeed, the reasons prohibiting contingency contracts should apply with more force in this

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 24 of 33

case against Ms. Napp and Balance Point because they are technically not subject to the Court rules governing Montana lawyers. *See* 95 Minnesota Law Review 2010- 2011, 1268, 1287.   Moreover, it is worth noting that the Gallatin County Court presiding over the divorce proceedings was not aware of Balance Point and Ms. Napp's purchase of  Ms. Masters' marital claims (and therefore were not subject to the Court's jurisdiction) until after a settlement agreement was reached by the real parties in interest in the divorce proceedings.

In line with the above, it is well established that any agreement between one spouse and a third person which is intended to facilitate or promote the procurement of a divorce or the separation of the spouses is contrary to public policy and therefore void. For example, in *Barngrover v. Pettigrew*, (1905) 128 Iowa 533, 104 NW 904, the court declared an agreement between the defendant husband and a detective agency void as a matter of law whereby the detective agency was to provide proof of the wife's infidelity, and where the fee for its services was dependent upon whether the husband was successful in securing a divorce. The Court further explained that "[t]he marriage relation is sacred, and one which the law will encourage and maintain when formed. Its dissolution will not be left to

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 25 of 33

the caprice of the parties themselves, nor will it be permitted to rest on the interference of strangers. Hence any agreement conditioned on the obtainment of divorce, or intended or calculated to facilitate its obtainment, is void. Such is the settled policy of the law as expressed in the universal rule adopted by the courts." Multiple citations omitted. Also, in *Bergoff Detective Service, Inc. v. Walters,* (1933) 239 App Div 439. 267 NYS 464, the Court held an agreement with a husband and a detective agency void as a matter of law wherein the detective agency was tasked with establishing proof of the wife's infidelity, but it was to receive no compensation unless it secured evidence of infidelity allowing the husband to succeed in the underlying divorce. The Court held the agreement was void as a matter of law due to the contingent nature of the compensation.

V.   <u>Nationwide Case Law Concerning the Litigation Funding Industry.</u>

Litigation funding is a relatively new industry. The guiding principle of the few reported cases however provides that if the lender influences or "intermeddles" in the litigation the funding contract is void.  See *Odell v. Legal Bucks*, *LLC,* 192 N.C.App. 298, 304-310, 665 S.E.2d 767, 774-775 (2008).  (The underlying litigation financing

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 26 of 33

agreement was not void as there was no evidence that the lender exerted any control over the claim and then lender only had an interest in the proceeds of the claim rather than an interest in the claim itself but nonetheless the Court found the agreement void as it violated the State's consumer financing laws.) *Rancman v. Interim Settlement Funding Corp.,* 99 Ohio St.3d 121, 125, 789 N.E.2d 217, 221 (2003) (holding that "an intermeddler is not allowed to gorge upon the fruits of litigation" and a contract making the repayment of funds advanced to a party to a pending case contingent upon the outcome of that case is void.) *Johnson v. Wright,* 682 N.W.2d 671, 678 (Minn. App. 2004) (holding that an assignment agreement whereby the funding company received a total of 26.7% of the litigant's right, claim, and interest to any and all recovery was declared void as a matter of law inasmuch as through the agreement the funding company "effectively intermeddled and speculated in appellant's litigation and its outcome"); *Anglo-Dutch Petroleum Intern., Inc. v. Haskell,* 193 S.W.3d. 87, 104 (Tex App. Houston 1st Dist. 2006), (wherein the Court held that an investors' advancement of funds to support litigation by two petroleum companies was not void as a matter of law because, among other things, there was no

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 27 of 33

evidence that the investors maintained any control over the litigation); and, *Farenholz v. Security Mut. Ins. Co.,* 13 A.D.3d 1085, 1086 788 N.Y.S.2d 546, 547 (N.Y. App. Div. 4th Dept. 2004) (wherein the Court held an assignment of the potential proceeds not void as a matter of law where the assignment was not for the insured's claim but only for proceeds of the claim and there was no ceding control of the litigation.)

VI.     Balance Point's Funding Documents Cannot be Reconciled with the Montana Supreme Court Case of *In Re Rules.*

Although the Montana Supreme Court has not addressed whether a litigation funding company can fund a divorce proceeding, provide "consultation" and "ancillary services" to the funded spouse, and be "substantively" involved with strategy decisions in the case, the Montana Supreme Court case of *In Re Rules of Prof. Conduct and Insurer Imposed Billing Rules and Procedures,* 2000 MT 110, 299 Mont. 321, 2 P.3d 806, 808 (2000) provides unequivocal clear guidance on this issue.

In, *In Re Rules,* the Court announced very clear rules and policies regarding the identity of the client in situations where a third party is paying the underlying legal bill. Among other things, the

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 28 of 33

Montana Supreme Court held that an attorney practicing law in Montana, including *pro hac vice* attorneys, may not abide by an insurer's billing and practice rules that impose conditions limiting or directing the scope of representation of the client.    Indeed, the insurer's influence at issue in *In Re Rules* --   which entailed a requirement for prior approval for certain litigation costs -- pales in comparison to the prolonged, pervasive, and substantive involvement of Balance Point and Ms. Napp in the underlying divorce proceedings.

VII. <u>Unauthorized Practice of Law By Balance Point and Stacey Napp.</u>

An independent reason for finding the Funding Document void as a matter of law rests upon the Funding Document's authorization for Balance Point and Ms. Napp to engage in the unauthorized practice of law, along with their subsequent extended unauthorized practice of law.   This included, but was not limited to, setting forth strategy and positions to be taken with the Court, red-lining and reviewing multiple briefs drafted by Ms. Masters' attorneys which were then filed with the Court, directing the attorneys to include factual and legal arguments, and to follow Ms. Napp's legal strategy,

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 29 of 33

and drafting cross-examination questions and requests for a subpoena.

In Montana, the practice of law is defined as follows:

Any person …. who engages in the business and duties and performs acts, matters, and things that are usually done or performed by and attorney at law in the practice of that profession…is considered to be practicing law.

M.C.A. § 37-61-201.

Clearly, Ms. Napp and Balance Point engaged in the unauthorized practice of law.

VIII.   <u>Recent Law Review Article Advocating against divorce litigation funding Based on Balance Point's Business Model.</u>

Since the phenomenon of non-lawyers investing in divorce claims is virtually brand new, there are almost no scholarly articles discussing the subject.  That which exists is critical.  See *A Call for Regulating Third-Party Divorce Litigation Funding,* White, K 13 J.Fam.Law 400 (2011), wherein the author advocated against litigation funding in divorce cases due to the risk of improper interference and influence by the lender because of the underlying policy concerns present in marital cases that are not implicated in commercial or personal injury cases.  Significantly, the author came to this conclusion based largely on his understanding of <u>Balance</u>

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 30 of 33

Point itself and Balance Point's business model as evidenced by Balance Point's website.   The author concluded that, "if divorce funding is permitted at all, the funder should be restricted to minimal initial contact and only updates from the attorney regarding the case. No influence and intermeddling in case strategy should be allowed."

IX. <u>Balance Point's Funding Document Has and Will Give Rise To Malpractice Claims.</u>

As an initial matter, the Funding Document will give rise to breaches of the attorney-client privilege (see MCA §26-1-803) and the attorney work product doctrine. Further, it will give rise to violations of additional Ethical Rules such as Rule 1.6 (regarding client confidentiality) Rules 1.1 (regarding competence), 1.8 (regarding Conflict of Interest-Responsibility to Third Person), 2.1 (regarding Independent Professional Judgment), and 5.4 (regarding Direction/Regulation of Professional Judgment by Third Persons).

X.   <u>If the Court Declares the Funding Document Void, All Claims Must Be Dismissed.</u>

If this Court determines that the Funding Document is void, all of the parties' claims should be dismissed with prejudice. See *Portable Embryonics, Inc., v. J.P. Genetics, Inc.,* (1991) (neither court

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 31 of 33

of law nor court of equity will aid one in enforcing illegal contract, nor give damages for breach of it, nor set it aside at suit of other, nor, when agreement has been executed in whole or in part by payment of money or transfer of other property, lend its aid to recover it back.) Also, as stated by *MPH Co. v. Imagineering, Inc.,* 1990, 243 Mont. 342, 792 P.2d 1081, "no principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out….the law, in short, will not aid either party to an illegal agreement.  It leaves the parties where it finds them….", citation omitted.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Lila Masters respectfully requests that this Court declare the May 24, 2011 and September 29, 2011 Funding Documents between Ms. Masters and Balance Point void as a matter of law, and dismiss all claims.

Respectfully submitted this 28th day of June, 2013.

/s/ Todd Shea
Todd Shea
Attorney for Lila Masters

*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 32 of 33

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of June, 2013, a copy of the foregoing document was served upon the following by:

Charles E. Hansberry                     [ ] U.S. Mail
Jeffrey Roth                             [ ] Fax
Garlington, Lohn, Robinson               [ ] Express Mail
PO Box 7909                              [xxxx] *CMIECF* filing
Missoula, MT 59807-7909                  [ ] Federal Express


/s/ Todd Shea
Todd Shea
Attorney for Lila Masters


## CERTIFICATE OF COMPLIANCE

I hereby certify that the forgoing Motion is double-spaced, is in 14 point type, and contains 6,490 words, excluding caption, signature, certificate of service, and compliance.

Dated this 28th day of June, 2013.

/s/ Todd Shea
Todd Shea


*Balance Point Divorce Funding, LLC v. Lila Masters, et al.*
Brief in Support of Motion for Summary Judgment to Declare Contract Void
Page 33 of 33